UNITED STATES of America,
Plaintiff-Appellee,

v.

Vincent MARTINO, John Torrioni, Poli-
cardo Despaigne, a/k/a "Paulie," Odell
Miller, a/k/a "Pluggy," John Radice,
and John Perry, Defendants-Appellants.

Nos. 1255–1256, 1262–1265, Dockets
81–1009 to 81–1014.

United States Court of Appeals,
Second Circuit.

Argued April 22, 1981.

Decided Nov. 5, 1981.

Arnold E. Wallach, New York City, defendant-appellant Martino.

Edward R. Dudley, Jr., White Plains, N.Y., for defendant-appellant Torrioni.

Stephen M. Pave, Coral Gables, Fla., for defendant-appellant Despaigne.

Alexander Potruch, Lake Success, N.Y. (Kenneth Koopersmith, Michael K. Feigenbaum, Koopersmith, Feigenbaum & Potruch, Lake Success, N.Y., on the brief), for defendant-appellant Miller.

Frank A. Lopez, New York City, for defendant-appellant Radice.

Marvin M. Kornberg, Kew Gardens, N.Y., for defendant-appellant Perry.

K. Chris Todd, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., S.D.N.Y., Mark F. Pomerantz, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before LUMBARD, OAKES and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Vincent Martino, John Torrioni, Policardo Despaigne, a/k/a "Paulie," Odell Miller, a/k/a "Pluggy," John Radice, and John Perry appeal from judgments of conviction entered after a jury trial in the United States District Court for the Southern District of New York, Lloyd F. MacMahon, *Chief Judge.* Count One of the three-count indictment charged all six defendants with conspiring to distribute heroin and cocaine between January and October 1980 in violation of 21 U.S.C. § 846 (1976). Count Two charged Martino with distributing and possessing heroin with intent to distribute it on May 1, 1980, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A) (1976); and Count Three charged him with possession of heroin with intent to distribute it on June 12, 1980, in violation of the same sections. The jury found each defendant guilty as charged.

Martino was sentenced, on each of the three counts, to a twenty-year term of imprisonment, a six-year term of special parole, and a $50,000 fine, all terms and fines to be concurrent. Miller was sentenced to twenty years' imprisonment and a $50,000 fine. Despaigne and Radice received sentences of ten years' imprisonment and fines of $5,000. Torrioni and Perry were sentenced under the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026 (1976), to indeterminate terms of custody for treatment and supervision.

On appeal defendants challenge a number of trial and pretrial rulings, including the court's refusal to suppress a large quantity of heroin found in a brown paper bag in Martino's back yard. Finding no merit in any of the defendants' contentions, we affirm the convictions.

## I. BACKGROUND

The proof at trial established that Martino was a substantial wholesale dealer in heroin and cocaine. He purchased large quantities of both drugs from Radice and Perry, and purchased cocaine from Despaigne. Martino sold heroin to Despaigne and Miller. Torrioni served as an aide to Martino. The trial evidence consisted principally of the testimony of Frank DeFelice, a paid confidential informant who had posed as a buyer of substantial quantities of heroin and cocaine and purchased various amounts of heroin from Martino; the testimony of a number of special agents of the United States Drug Enforcement Agency ("DEA") who had conducted surveillances of one or more of the defendants; tape recordings and transcripts of conversations

to which one or more of the defendants were party, including some fifty conversations intercepted during a court-authorized wiretap of the telephone at Martino's narcotics headquarters during a two-week period in June 1980; and a variety of physical evidence. The physical evidence included heroin obtained from Martino, Radice, and Perry, having a retail value of approximately $1,000,000; and more than 1,000 rounds of ammunition, a bullet-proof vest, and narcotics trafficking tools such as cutting agents, plastic bags, and testing equipment, all seized from a "stash pad" maintained by Radice and Perry. Because only limited attacks are made on the sufficiency of the evidence, a short summary of the pertinent events proven at trial will suffice here.[1]

In the early spring of 1980, DeFelice was taken by a companion, Arthur LaCilento, to Martino's Bronx apartment, which then served as Martino's narcotics headquarters, and was introduced to Martino and Torrioni. At that first meeting there was a large pile of white powder, apparently cocaine, on a sheet of glass on Martino's living room table; Martino dipped a straw into the powder and sniffed some into each nostril, then invited DeFelice to do the same. During that meeting LaCilento asked if Martino had "that thing" for him, whereupon Martino produced a small plastic envelope containing a white substance, placed it in a package of matches, and handed it to LaCilento.

In the days and weeks that followed, DeFelice met with Martino a number of times to discuss the possible purchase of heroin and cocaine by DeFelice from Martino, and the quality of heroin that Martino could supply.[2] On May 1, DeFelice purchased three ounces of heroin from Martino. Other negotiations followed. On one occasion, when DeFelice sought to purchase one-half ounce of pure heroin for $5,000, Martino attempted to get it from a "couple of his connections," but was unsuccessful and told DeFelice he could supply a full ounce of pure heroin the next day for $11,000. When DeFelice showed up the next day with only $5,000, asking again for only one-half ounce, Martino became angry because he had needlessly caused his connections to "go to the stash." One week later, on June 12, DeFelice returned to Martino's apartment with $11,000, asking for a full ounce of pure heroin and hoping to cause Martino to travel to one of his sources to obtain it. Martino, however, had an ounce of heroin in his apartment that he assured DeFelice was pure. No sale was consummated because when DeFelice (whose goal was not to make a purchase but to cause Martino to contact his connections) questioned whether the heroin was pure, Martino became angry and told DeFelice to go away and not to return.

■ In the meantime, as discussed in greater detail in Part II.A. *infra*, the government had obtained court authorization to place a wiretap on the telephone in Martino's apartment. The tap went into operation on June 2 and was continued for two weeks. Some fifty conversations relating to narcotics transactions[3] were inter-

---

1. None of the defendants testified at trial. The only defense witness was the girlfriend of Torrioni, who testified that she had accompanied Torrioni on non-narcotics-related errands for Martino and that she had given Torrioni certain gold jewelry that was in his possession when he was arrested.

2. For all but one of his meetings with Martino, DeFelice wore a recording device.

3. Many, if not all, of the telephone conversations used coded language to obscure the fact that narcotics were the subject of the conversations. Some coded language or slang was explained by Martino to DeFelice during their meetings. For example, when Martino was as-

suring DeFelice that the quality of some heroin Martino had available was sufficiently high to be cut with a large amount of diluent, he said, "The thing is that it stands a twenty-five"; "That means you could make twenty-five ounces out of [one ounce of] it." At trial, DeFelice explained the meanings of various slang terms used in his conversations with Martino. In addition, over defendants' objection, there was testimony from Frederick Sandler, a DEA agent who had worked in an undercover capacity on hundreds of occasions and in that capacity negotiated for and purchased heroin or cocaine more than 100 times. He had monitored some 15–20 wiretapped conversations relating to narcotics. Sandler testified that the words her-

cepted, including seventeen conversations between Miller on the one hand, and Martino, Torrioni, or an unidentified woman from Philadelphia on the other, eleven conversations between Despaigne and Martino, and four conversations between Perry and either Martino or Torrioni.

On August 8, 1980, DeFelice renewed contact with Martino to discuss the purchase of one-eighth of a kilogram of pure heroin and to discuss the availability of cocaine. Martino persuaded DeFelice to accept a lower quality heroin that he had available, and on that date sold DeFelice one-eighth of a kilogram of 66.1% pure heroin. In addition, he provided DeFelice with a sample of 93.7% pure cocaine. The delivery of these narcotics took place at a rendezvous to which Martino was driven by Radice and Perry.

On August 19, Martino agreed to sell DeFelice one kilogram of pure heroin for $260,000. On August 20, however, Martino reported that although his sources had been expecting a delivery of thirty kilos of heroin, they presently had only one-half kilo on hand. DeFelice agreed to purchase this amount for $150,000, telling Martino, falsely, that the money was in the trunk of DeFelice's car. Martino accepted DeFelice's representation and said that they would have to wait for a telephone call. After the call was received, Martino and DeFelice entered the latter's car at approximately 6:10 p.m., with Martino driving. Martino proceeded to drive so evasively that only one car, carrying two of the nine DEA agents assigned to follow him and DeFelice, was able to keep up with them to their eventual destination, which was Martino's house in Queens.

On arriving at Martino's house, Martino and DeFelice entered Martino's yard, which was enclosed by a four-foot high, chain-link fence, leaving the gate open. Immediately Perry and Radice arrived in another car and double-parked near the open gate. Martino walked to the car and Radice handed him a paper bag. Martino placed the bag inside his shirt, and Radice and Perry drove away. Martino reentered the yard, placed the paper bag on a chair and put a telephone book over it, and turned to DeFelice and said, "There is your stuff." DeFelice stated that he would test it, and he and Martino then walked to the trunk of DeFelice's car where DeFelice removed some heroin testing equipment and gave the DEA agents the signal to arrest Martino. The agents arrested Martino, DeFelice told Agent John Toal that the heroin was in the chair in the yard, and Toal immediately accompanied DeFelice through the open gate to the yard to retrieve the bag, which was later determined to contain approximately one-half kilo of 87.8% pure heroin. Toal seized the bag and looked inside it, then immediately left to pursue Radice and Perry, just as another agent arrived in an undercover taxicab. Toal and the latter agent drove off in pursuit of Radice and Perry, and shortly encountered the two driving back toward Martino's house. After various automotive maneuvers and collisions, Radice and Perry were stopped and arrested.

Approximately one month later, Torrioni, Despaigne, and Miller were arrested. When confronted by DEA agents, Torrioni attempted to throw away four playing cards that he held in his hand. These cards contained traces of cocaine. When Despaigne was arrested, he gave the authorities a false name, and produced a driver's license in that name. Upon Miller's arrest outside his apartment, agents searched his apartment and found an envelope bearing the notation "4 oz".

oin and cocaine are rarely used in telephone conversations and that codes are used. He gave his opinion that the recorded conversations involved narcotics transactions and translated various portions of them for the jury. The district court properly instructed the jury that it need not accept Sandler's opinions and was free to draw its own conclusions as to the meanings of the conversations, and the receipt of this expert testimony was an entirely proper exercise of the court's discretion. *United States v. Cirillo*, 499 F.2d 872 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. Borrone-Iglar*, 468 F.2d 419 (2d Cir.), *cert. denied*, 409 U.S. 981, 93 S.Ct. 347, 34 L.Ed.2d 244 (1972), 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973); Fed.R. Evid. 702.

This prosecution followed. Prior to trial, a number of the defendants moved to suppress various items of evidence that had been seized. Pertinent to this appeal are Martino's motion to suppress the recordings and transcripts of conversations intercepted pursuant to the court-ordered wiretap of his telephone on grounds that the statutory prerequisites for a wiretap had not been met, Martino's motion to suppress the heroin seized from his yard following his arrest on the ground that the seizure and search of the bag violated his rights under the Fourth Amendment to the Constitution, and Miller's motion, on similar constitutional grounds, to suppress the envelope seized from his apartment following his arrest. The district court denied these motions. After hearing argument, the court determined that the wiretap had been properly authorized and implemented pursuant to 18 U.S.C. § 2518 (1976). After an evidentiary hearing with respect to the seizure of the heroin, the court found that exigent circumstances existing at the time of Martino's arrest justified the warrantless entry into the yard to seize the heroin. After an evidentiary hearing with respect to Miller's motion, the court found that Miller had consented to the search of his apartment and that in any event, exigent circumstances permitted a warrantless entry to prevent the removal or destruction of evidence.

## II. DISCUSSION

On this appeal the defendants make a variety of arguments. Martino and Miller challenge the district court's denial of their motions to suppress. Radice, Perry, and Despaigne argue that the proof showed multiple conspiracies rather than a single conspiracy, and that the jury should have been instructed to that effect. And Miller and Torrioni contend that the evidence presented at trial was insufficient to establish that they were members of the conspiracy. We find no merit in these or any of the defendants' other arguments.

### A. The Wiretap

Martino's motion for an order suppressing the recordings of conversations on his telephone made pursuant to the court-authorized wiretap asserted (1) that the information given in support of the May 28 request for the wiretap authorization was stale, (2) that there was insufficient basis for the court authorization of the tap because the government could have used less intrusive means of obtaining evidence, and (3) that the execution of the wiretap warrant was impermissibly delayed. We conclude that the motion was properly denied.

The procedure for obtaining federal authorization to intercept telephonic communications is set forth in 18 U.S.C. § 2518. In pertinent part, § 2518(3) provides that upon a proper written application,

the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter [§ 2516(e) lists various narcotics dealing offenses, including those charged here];

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; . . .

■ It is elementary that the probable cause needed to validate the issuance of an authorization for a wiretap must exist at the time of issuance. *United States v. DePalma*, 461 F.Supp. 800, 809 (S.D.N.Y.1978); *see United States v. Kirk*, 534 F.2d 1262, 1274 (8th Cir. 1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977); *United States v. Tortorello*, 342 F.Supp. 1029, 1037 (S.D.N.Y.1972), *aff'd*, 480 F.2d 764 (2d Cir.), *cert. denied*, 414 U.S. 866, 94

S.Ct. 63, 38 L.Ed.2d 86 (1973). *Cf. Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932) (search warrant); *United States v. Perry,* 643 F.2d 38, 49–50 (2d Cir. 1981) (search warrant). *See* 1 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 3.7(a) (1978). The determination of whether information presented in support of an application is sufficiently current to support a finding of probable cause is one that must be made on the basis of the facts of each case. *Sgro v. United States, supra; United States v. Diecidue,* 603 F.2d 535, 560 (5th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980). Although many factors will have some relevance, *see* 1 LaFave, *supra,* § 3.7(a), the principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law. Where the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant. *United States v. Hyde,* 574 F.2d 856 (5th Cir. 1978); *Mapp v. Warden,* 531 F.2d 1167, 1171–72 (2d Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976); *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir. 1972).

In the present case District Judge Pierre Leval issued the warrant authorizing the wiretap on Martino's telephone, making the probable cause determinations required by the statute. His findings, which are entitled to deference, *see, e. g., United States v. Perry, supra; United States v. Jackstadt,* 617 F.2d 12, 13 (2d Cir.), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *Mapp v. Warden, supra,* are amply supported by the facts presented in the affidavit of DEA Special Agent Martin Maguire. That affidavit, which has in no way been impugned by Martino, relied in large part on information provided by two persons: one was DeFelice, who was not identified by name, but was described as a confidential informant who had already supplied DEA agents with information on three occasions leading to six arrests and six convictions for violations of federal narcotics laws, *see Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); the other person was LaCilento, the companion who had introduced DeFelice to Martino. LaCilento, an unknowing target of the investigation, had had several conversations with DEA Special Agent Ronald Catanese, who was operating in an undercover capacity. The Maguire affidavit showed that on a number of occasions between March 27, 1980, and May 6, 1980, Martino was engaged in narcotics trafficking. On March 27, DeFelice and LaCilento observed in Martino's apartment a large quantity of cocaine and about $10,000 in small bills. During that visit, Martino received three drug-related telephone calls, apparently from three different persons; Martino told one caller that he owed Martino $38,000. On March 28 and April 3, LaCilento told Catanese that Martino was his source for heroin and high quality cocaine. On May 1, DeFelice purchased heroin from Martino. On May 6, DeFelice made his final payment for the heroin purchased on May 1, and observed in Martino's apartment two ounces of powder that appeared to be cocaine. On that date, Martino told DeFelice that Martino could sell two kilograms of heroin for $90,000 within the next ten days.

The recitation of these facts showed an ongoing operation and a continuing pattern of conduct. It quite adequately established that probable cause existed for the issuance of the warrant on May 28, despite the fact that the latest event described occurred on May 6. As concluded by Chief Judge MacMahon in his denial of Martino's motion to suppress, "[t]he pre-wiretap investigation spanned three months and uncovered evidence of an ongoing drug-trafficking conspiracy that would not turn stale after a mere three-week hiatus."

Martino's next contention, that other investigative techniques should have been used in preference to a wiretap, fares

no better. Although § 2518(3)(c) requires a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried, ...," the statute does not require that all possible techniques be tried before a wiretap may be authorized. *E. g., United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979), 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980); *United States v. Fury*, 554 F.2d 522, 529–30 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977), 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), 429 U.S. 1051, 97 S.Ct. 764, 50 L.Ed.2d 767, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977). As we stated in *United States v. Fury*,

> the purpose of these "other investigative techniques" requirements "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." ... Moreover, the required showing is to "be tested in a practical and commonsense fashion." 1968 U.S.Code & Admin.News, *supra*, at p. 2190. In short, the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974).[7]

> [7] And the more traditional surveillance techniques need not be exhausted first if they are "impractical" or "costly and inconvenient." *United States v. Robertson*, 504 F.2d 289, 293 (5th Cir. 1974), *cert. denied*, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975) (undercover agents).

554 F.2d at 530.

■ The Maguire affidavit provided a sound basis for Judge Leval's finding that normal investigative techniques either had been tried without success, or were likely to fail if tried. The wiretap was sought not merely to obtain further evidence about Martino, but also to discover such facts as the identities of Martino's suppliers and customers and the locations used in the drug distribution operation. Maguire's affidavit described attempts to have DeFelice introduce undercover agent Catanese to Martino in hopes that Catanese might ferret out the identity of Martino's sources. Martino, however, would have nothing to do with Catanese and demanded that he leave the vicinity of Martino's apartment. Maguire described attempts to follow Martino in an automobile, only to have Martino drive evasively by making U-turns ("as many as three in one block"), squaring blocks, running red lights, and so on. Maguire also explained the inadequacy of other investigative techniques, such as acquisition of telephone toll records and use of pen registers, which do not identify the participants to a telephone conversation, and hence would be unlikely to uncover Martino's partners in crime. Thus, the requirements of § 2518(3) were met, and Chief Judge MacMahon did not err in refusing to suppress the wiretap recordings on this basis.

■ Finally, Martino challenges the government's delay in implementing the wiretap. Section 2518(5) requires that an order authorizing a wiretap provide that the authorization be executed as soon as practicable, and Judge Leval's May 28 order so provided. On June 2, however, Judge Leval was advised by the Assistant United States Attorney that "due to a series of technical difficulties, no conversations were intercepted from May 28, 1980, to June 2, 1980. Those problems have been corrected and the interception is expected to commence today." This delay provided no basis for suppression of the wiretap recordings.

First, Martino has suggested no reason for believing that the delay was a willful act on the part of the government, rather than the result of technical difficulties as reported. Thus there is no support for the proposition that the tap was not implement-

ed as soon as it was practicable. Second, although an argument could be made for voiding a wiretap authorization where during the period of delay the information leading to the finding of probable cause has become stale, *see* 2 LaFave, *supra,* § 4.7(a) (1978), no such circumstance existed here. Given the ongoing nature of the narcotics activities described in DEA Agent Maguire's affidavit, we agree with the implicit finding of Judge Leval, who did not vacate the wiretap authorization upon receiving the report of the delay, that the information supporting the authorization had not become stale in the intervening five days.

### B. *The Seizure of the Heroin from the Yard*

Martino's other principal contention on appeal is that both the warrantless entry of DEA Agent Toal into Martino's yard to seize the bag of heroin and the warrantless search of the bag violated Martino's rights under the Fourth Amendment. Given the circumstances surrounding the seizure, Martino's claims must be rejected.

#### 1. *The Entry and Seizure*

The starting point for analysis of a Fourth Amendment claim is the principle that "a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). The government contends that the warrantless entry into Martino's yard was lawful under the "exigent circumstances" exception to the warrant requirement. While it is not clear to us that a general exception for exigent circumstances has been '*well*-delineated,' we agree that under the circumstances existing here, the entry and seizure were lawful.

Although the Supreme Court has not ruled directly on the existence of an exception for exigent circumstances, we have noted previously, *see United States v. Vasquez,* 638 F.2d 507, 530 (2d Cir. 1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 528, 70 L. Ed.2d 396 (1981), that recognition of such an exception is consistent with dicta in a number of Supreme Court cases

such as *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). *See also New York v. Belton,* —— U.S. ——, ——, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981) (" 'the exigencies of the situation' may sometimes make exemption from the warrant requirement 'imperative.' "); *Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981) ("The search at issue here took place in the absence of consent or exigent circumstances. Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant."). Our Court has ruled that when law enforcement officers have lawfully entered premises to effect an arrest, they are entitled to make a quick and limited "security check" of the premises to be sure there are no third persons present who might destroy evidence or pose a safety threat to the officers. *United States v. Gomez,* 633 F.2d 999 (2d Cir. 1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *see United States v. Agapito,* 620 F.2d 324, 335–36 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). Further, we have held that where a lawful arrest was made on the street outside the defendant's apartment, and the officers had a legitimate basis for believing there were other persons inside the apartment who were likely to be aware of the arrest and therefore might destroy evidence in the apartment, a warrantless entry into and security check of the apartment was permissible. *United States v. Vasquez, supra. Accord: United States v. Baker,* 577 F.2d 1147, 1152 (4th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978); *United States v. Bowdach,* 561 F.2d 1160, 1168–69 (5th Cir. 1977).

The instant case presents a somewhat different, but no less compelling, set of circumstances which we believe justifies a warrantless entry into a yard to prevent the removal or destruction of evidence. The DEA agents lawfully placed Martino under

arrest, and were eager both to apprehend his coconspirators, Radice and Perry, who had just delivered a million-dollar package of heroin, and to take custody of the heroin. Because of Martino's evasive driving to the rendezvous in Queens, however, and because trees had impeded the planned helicopter surveillance, only two DEA agents, Maguire and Toal, were present at the time of Martino's arrest. Maguire took charge of Martino, leaving Toal to accomplish the other objectives. Toal ran to DeFelice and learned that Martino had put the heroin on a chair in the yard and placed a telephone book over it. Toal entered the yard, retrived the bag, looked into it, and immediately ran off to chase Radice and Perry. Martino may have had privacy expectations in his yard which were disappointed by Toal's entry, see *Wattenburg v. United States*, 388 F.2d 853 (9th Cir. 1968) (open yard 20–30 feet from lodge protected by Fourth Amendment); *but see Lewis v. United States*, 385 U.S. 206, 210–11, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966) (home "converted into a commercial center" by invitation of government agent to enter and sale therein of narcotics to agent). But the circumstances in which Toal was required to act provided no reasonably satisfactory alternative. The agents had learned through the wiretaps that accomplices of Martino were in the habit of frequenting his premises. Thus, had Toal foregone the opportunity to seize the heroin in order to pursue Radice and Perry he would have chanced the theft or destruction of the heroin in his absence, either by accomplices of Martino (perhaps even by Radice and Perry who apparently had doubled back: they were encountered minutes later proceeding *toward* Martino's house), or by an occupant of the house, or by any other person inclined to enter a yard at 7 o'clock on a summer evening. On the other hand, for Toal to have guarded the yard, awaiting the arrival of additional agents who could telephone for a search warrant, would have allowed Radice and Perry to escape. We conclude that the considerable risk that if Toal did not enter the yard and seize the heroin he would allow either the contraband or the culprits to get away, presented circumstances sufficiently exigent to warrant Toal's unauthorized entry into the yard and seizure of the heroin.

2. *The Search of the Brown Bag*

Finally Martino contends that even if Toal's seizure of the brown paper bag containing the heroin was lawful, the inspection of the contents of the bag was unlawful in the absence of a search warrant. Law enforcement officers in lawful possession of a receptacle may search the receptacle if there is probable cause to believe it contains evidence of a crime and if its owner has no reasonable, independent expectation of privacy in that receptacle once it has been removed from his custody or control. *E. g., Robbins v. California,* —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Mannino*, 635 F.2d 110, 114–15 (2d Cir. 1980). The government argues that no paper bag is entitled to such an independent privacy protection, and that in any event Martino did not exhibit the requisite privacy expectation in the bag at issue here. We agree with the latter proposition.

In determining whether an owner has a constitutionally protected expectation of privacy in a container that has been lawfully seized, most federal courts of appeals have considered that an important factor is the nature of the container. Distinguishing between items such as luggage or purses, which have a " 'fundamental character as a repository for personal, private effects'," and impermanent, insecure types of containers, such as paper bags, that offer at best only minimal protection against intrusions, see *United States v. Mannino, supra,* 635 F.2d at 114, quoting *Arkansas v. Sanders, supra,* 442 U.S. at 762 n.9, 99 S.Ct. at 2592 n.9, most Circuits, including our own, have concluded that paper bags that are unsealed and unsecured generally do not warrant independent constitutional protection. *See, e. g., United States v. Mefford,* 658 F.2d 588 (8th Cir. 1981); *Virgin Islands*

*v. Rasool*, 657 F.2d 582 (3d Cir. 1981); *United States v. Sutton*, 636 F.2d 96 (5th Cir. 1981); *United States v. Brown*, 635 F.2d 1207, 1211 (6th Cir. 1980); *United States v. Goshorn*, 628 F.2d 697, 700–01 (1st Cir. 1980); *United States v. Mackey*, 626 F.2d 684, 687 (9th Cir. 1980); *United States v. Jimenez*, 626 F.2d 39, 41 (7th Cir. 1980) (semble), *vacated and remanded,* —— U.S. ——, 101 S.Ct. 3152, 69 L.Ed.2d 1000 (1981). The rationale supporting these conclusions is not so much that an individual does not have some subjective expectation of privacy in a paper bag, but rather that such an expectation may so easily be thwarted in so many ways that the subjective expectation is not generally felt to be entitled to constitutional recognition. As stated in *United States v. Mackey, supra,*

> [a] paper bag is among the least private of containers. It is easily torn, it cannot be latched, and, to a greater extent than most containers, its contents can frequently be discerned merely by holding or feeling the container.

626 F.2d at 687. *See also* dissent on this issue by Judge Tamm in *United States v. Ross*, 655 F.2d 1159 (D.C.Cir.1981) (en banc) (Tamm, J., dissenting in part), *cert. granted,* —— U.S. ——, 102 S.Ct. 386, 70 L.Ed.2d 205 (1981):

> First, paper bags offer at best only minimal protection against accidental and deliberate intrusions. A paper bag can fall open or break very easily. It presents no real obstacles to invasions by the curious or the dishonest once it has left its owner's actual possession. Because it is neither so secure nor so permanent as typical forms of luggage, its contents are much more likely to become subject to public display than if the same items had been stored in luggage. Thus, it is doubtful that one realistically can expect a paper bag to remain closed or intact, its contents unrevealed, at least if it has left its owner's hands. *See United States v. Mackey*, 626 F.2d 684, 687 (9th Cir. 1980). *Cf. United States v. Neumann*, 585 F.2d 355 (8th Cir. 1978) (cardboard boxes not secure; inventory search justified).

> Second, paper bags are not *inevitably* associated with the expectation of privacy. *See Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979). Although a paper bag *may* be pressed into service as a repository of personal effects, I do not believe a reasonable man would identify a paper bag as a normal place to entrust his intimate personal possessions. In contrast, luggage in general serves to carry clothes, toiletries, and other items associated with day-to-day living. Luggage typically functions as a portable closet and chest of drawers; it follows that a person could justifiably maintain a substantially higher expectation of privacy in his personal luggage than in a paper bag.

655 F.2d at 1177–78 (footnote omitted).

In keeping with this line of analysis, our Court has held that a paper bag that was not sealed but was merely folded closed and placed inside a white plastic bag that was also folded closed was not protected by any independent expectation of privacy. *United States v. Mannino, supra.* And we have held that a paper bag sealed with tape is not entitled to such protection where its contents were easily discernible by feeling the outside of the bag. *United States v. Ocampo*, 650 F.2d 421 (2d Cir. 1981). *See also United States v. Delos-Rios*, 642 F.2d 42, 46 (2d Cir.), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 330, 451 U.S. 941, 101 S.Ct. 2025, 68 L.Ed.2d 330 (1981) (no legitimate expectation of privacy in partially open paper bag). On the other hand, we have recognized a protected expectation of privacy in a securely taped plain cardboard box. *United States v. Dien*, 609 F.2d 1038, 1044–45 (2d Cir. 1979), *adhered to on rehearing,* 615 F.2d 10 (2d Cir. 1980).

The view among the Circuits that proper analysis of this issue turns in large part on the nature of the container, however, is not unanimous. In *United States v. Ross, supra,* the Court of Appeals for the District of Columbia Circuit, sitting en banc, held, with four of the eleven judges dissenting, that an untaped brown paper bag was entitled

to independent privacy protection, concluding that *Arkansas v. Sanders, supra*, "did not establish a 'worthy container' rule encompassing bags of leather but not of paper." 655 F.2d at 1161. Strong support for the *Ross* view is found in the recent plurality opinion of the Supreme Court in *Robbins v. California, supra*, 101 S.Ct. at 2843–47.

In *Robbins*, the Court reversed the denial of a motion to suppress packages wrapped in green opaque plastic, which had been placed in a recessed luggage compartment in a station wagon and were seized during a lawful warrantless search of the station wagon. After reviewing the Court's earlier decisions in *Arkansas v. Sanders, supra*, and other cases, the plurality opinion by Justice Stewart concluded that unless a container "is such that its contents may be said to be in plain view, those contents are fully protected by the Fourth Amendment." 101 S.Ct. at 2846. The plurality saw no foundation in the language of the Fourth Amendment for analysis on the basis of either the type of container or the nature of its contents. Thus, the opinion rejected the argument that only substantial containers traditionally used to "carry personal effects" were entitled to protection, stating that

> [w]hat one person may put into a suitcase, another may put into a paper bag. *United States v. Ross*, 655 F.2d 1159 (D.C. Cir. en banc). And as the disparate results in the decided cases indicate, no court, no constable, no citizen, can sensibly be asked to distinguish the relative "privacy interests" in a closed suitcase, briefcase, portfolio, duffel bag, or box.

*Id.* at 2846. The plurality concluded that no closed, opaque container, even if lawfully seized, may be opened without a search warrant.

The opinion of Justice Stewart was joined by three other members of the Court, Justices Brennan, White, and Marshall. Chief Justice Burger concurred in the judgment of the Court without authoring or joining any opinion. Justice Powell also concurred in the judgment, but he explicitly rejected the plurality's blanket proposition that no closed opaque container could be opened without a warrant. Construing *United States v. Chadwick, supra*, and *Arkansas v. Sanders, supra*, to

> require police to obtain a warrant to search the contents of a container only when the container is one that generally serves as a repository for personal effects or that has been sealed in a manner manifesting a reasonable expectation that the contents will not be open to public scrutiny,

*Robbins v. California, supra*, 101 S.Ct. 2849, Justice Powell concurred in the result "because the manner in which the package at issue was carefully wrapped and sealed evidenced petitioner's expectation of privacy in its contents." *Id.* at 2847. Justices Blackmun, Rehnquist, and Stevens dissented in separate opinions, each expressing the view that a search warrant should not be required for the search of any personal property found in an automobile when the automobile itself could lawfully be searched. *Id.* at 2851 (Blackmun, J., dissenting), 2851–55 (Rehnquist, J., dissenting), 2855–59 (Stevens, J., dissenting).

Since the Chief Justice concurred only in the judgment in *Robbins* and Justice Powell rejected the reasoning of Justice Stewart's opinion, no single rationale was endorsed by a majority of the Court. In these circumstances, the teaching of the Supreme Court is that "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ... *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 2923 n.15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). *See* Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum. L.Rev. 756 (1980); Note, *Plurality Decisions and Judicial Decisionmaking*, 94 Harv.L. Rev. 1127 (1981). Although neither *Gregg v. Georgia, supra*, nor *Marks v. United States, supra*, elaborated on what was meant by "narrowest grounds," we construe that phrase, for present purposes, as referring to the ground that is most nearly con-

fined to the precise fact situation before the Court, rather than to a ground that states more general rules. We find support for this construction in the fact that "[t]he Supreme Court itself has generally regarded the narrowest ground as the rationale offered in support of the result that would affect or control the fewest cases in the future." Note, *supra*, 80 Colum.L.Rev. at 764.

Within this framework we regard the holding of *Robbins v. California* as the formulation relied on by Justice Powell: that a package that is carefully wrapped and sealed in an opaque casing is protected by an independent, legitimate expectation of privacy and, absent some independent exemption from the warrant requirement,[4] may not be opened without a search warrant. This rationale is a faithful reflection of the factual circumstances before the Court and would control far fewer cases in the future than the broad proposition advanced by the plurality opinion that *no* closed, opaque container may be opened without a search warrant. Thus, however convenient it would be to have resort to a "bright line" rule, no such test—either a rule that all closed opaque containers are protected, as posited by the *Robbins* plurality, or a rule that no items found in automobiles are protected, as contended for by the *Robbins* dissenters, or a rule that no paper bags are protected, as contended by the government—has been adopted by the

Court. We conclude that the Court's holding in *Robbins* does not overrule the view, adopted by nearly all of the federal courts of appeals, that a closed but unsealed, unsecured paper bag is not necessarily protected by an independent expectation of privacy, and that a determination must be made in each case as to the existence and reasonableness of such an expectation.[5] *Accord: Virgin Islands v. Rasool, supra*, 657 F.2d at 592–93.

Applying the holding in *Robbins* and the previous decisions of this Court, *e. g., United States v. Mannino, supra; United States v. Ocampo, supra; United States v. Delos-Rios, supra*, to the present case, our inquiry must focus on whether, in the circumstances, Martino had a reasonable, independent expectation of privacy in the bag of heroin. We are persuaded that he did not. Among the factors that lead us to this conclusion are the condition of the bag and Martino's statement as to its contents.

While there is little in the record describing the precise condition of the bag, it is clear that the bag was not taped or otherwise sealed shut. Nor was there any other objective, external evidence of an expectation of privacy for the bag itself. Martino's placement of the telephone book atop the bag may have assisted to conceal the bag initially, but it did not invest the bag itself with any greater degree of permanence or security; and once the bag had

---

**4.** For example, in *New York v. Belton, supra*, decided the same day as *Robbins*, the Court held that any package found within the passenger compartment of an automobile seized pursuant to a "lawful custodial arrest" may, for reasons of safety, be searched without a warrant:

> [W]e hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

> It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach. *United States v. Robinson, supra; Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d

327. Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have.

101 S.Ct. at 2864 (footnotes omitted).

**5.** We are aware that shortly after rendering its decision in *Robbins*, the Court vacated the judgment of the Seventh Circuit in *United States v. Jimenez, supra*, and remanded for reconsideration in light of *Robbins*. Since the opinion in *Jimenez* did not indicate whether the paper bag found in the trunk of that defendant's car had been sealed or otherwise fastened, we do not view the Court's order of vacation and remand as detracting from our interpretation of the *Robbins* holding.

been legally seized, the book had no further role.

■ Moreover, although there is no suggestion in the record that Agent Toal was able to ascertain the contents of the package either by looking at it, *see Arkansas v. Sanders, supra*, 442 U.S. at 764 n.13, 99 S.Ct. at 2593–94 n.13, or "simply by feeling the outside of the bag," *United States v. Ocampo, supra*, 650 F.2d at 428–29, it is clear that he was well aware of the contents (practically to the nearest gram) because of Martino's own prior statements. Thus, prior to the rendezvous with Radice and Perry, Martino had told DeFelice that he would supply one-half kilo of pure heroin, and DeFelice so informed the DEA agents before the trip to Martino's house. When Martino received the package, he told DeFelice, "There is your stuff," a statement they both understood to mean, "There is your half-kilo of nearly pure heroin." Martino's revelation of the contents of the bag demonstrates at the very least a reduced expectation of privacy. *See Robbins v. California, supra*, 101 S.Ct. at 2854 (Rehnquist, J., dissenting); *United States v. Candella*, 469 F.2d 173, 175 (2d Cir. 1972) (defendant's "statement [to the arresting officers] that the guns were in the containers" had the "practical effect" of putting the guns in "plain view.") Any time an individual discloses the contents of a package, he reduces his ability to keep the contents secret. When the disclosure is made to a government informant, there is no further reasonable expectation of privacy.

In light of all the circumstances, therefore, we conclude that Martino did not have a reasonable expectation of privacy sufficient to justify independent constitutional protection of the paper bag seized from his yard. Thus a search warrant was not required, and the district court properly denied Martino's motion to suppress.

### C. The Search of Miller's Apartment

The only evidence introduced against Miller that had been seized from his apartment was an envelope bearing the notation "4 oz". On this appeal Miller contends that the warrantless entry and search of his apartment following his arrest outside the building violated his Fourth Amendment rights and that the district court erred in denying his pretrial suppression motion. We disagree.

■ A warrantless search of a home is not unreasonable within the meaning of the Fourth Amendment if it has been voluntarily consented to by one having authority over the premises. *Schneckloth v. Bustamonte, supra; United States v. Sanchez*, 635 F.2d 47, 58–59 (2d Cir. 1980); *see United States v. Vasquez, supra*, 638 F.2d at 524. Whether a consent to a search was voluntary or instead was the product of coercion is a question of fact to be determined by the district court from the totality of the circumstances. *Schneckloth v. Bustamonte, supra; United States v. Sanchez, supra.*

■ The evidence presented at the suppression hearing in the present case included the following facts. Miller and a companion, Marcellus Henderson, were arrested outside the rear entrance to Miller's apartment building and taken in handcuffs to a DEA car. Since a crowd was gathering, the agents drove around the block, eventually parking on Columbus Avenue less than one block east of Miller's apartment. Miller was in the back seat of one government car, and a second government car was parked behind it.

During the trip around the block, Agent Brogan asked Miller if he would consent to a search of his apartment. Miller asked the object of the search, and Brogan replied "narcotics and narcotic-related material." Miller stated that he had nothing in the apartment but a large sum of cash from his book-making business, and refused to consent to a search. Agent Mitchell therefore asked Brogan to check whether a search warrant had been or was being obtained. At some point during the trip around the block, the agents checked Henderson's record and released him; Henderson, however, remained nearby throughout.

After the DEA cars were parked on Columbus Avenue, Agent Mitchell advised Miller of his rights under *Miranda v. Arizo-*

*na*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Agents Gray and Mitchell then repeated the request for permission to search the apartment; Miller again refused. Agent Brogan, meanwhile, telephoned other DEA agents and learned that they were seeking a search warrant. Brogan then removed a four-foot-long sledge hammer from the trunk of the second government car, and Miller was informed that when the search warrant was obtained, if Miller did not provide keys to the apartment it would be necessary for the agents to break down the door.

Soon thereafter, Miller orally gave his permission for a search. He was taken to his apartment, where he admitted three DEA agents, together with Henderson and an unidentified woman whose presence had been requested by Miller. Upon entry, Agent Brogan asked Miller to sign a consent form which he had written out by hand on a sheet of looseleaf paper. Brogan read the statement aloud and Miller signed it. (The agents lost the signed consent form and it was not available at the hearing.) The agents then searched the apartment, seizing $8,000 in cash, to which Miller had directed them, and the envelope currently at issue, which they had discovered in a drawer in the bedroom night table.

■ Miller did not testify at the hearing and called no witnesses. The district court rejected as unsupported by the evidence Miller's argument that the spectre of the sledge hammer had implied a threat to destroy the apartment and thus coerced his consent. The court found that the agents had fully informed Miller of his *Miranda* rights, and that they had at no time threatened him. After "the most careful consideration," the court concluded that Miller's consent was voluntary, uncoerced, and unconditional. Given all the circumstances, these findings are not "clearly erroneous." We thus uphold the denial of the suppression motion on the ground that Miller consented to the entry and search of his apartment.[6]

### D. *The Multiple Conspiracy Contention*

■ Radice, Perry, and Despaigne contend that the evidence admitted at trial did not establish the existence of a single overall conspiracy among themselves, Martino, Torrioni, and Miller, lasting for a period of six months or more, as charged in the indictment. They contend that the evidence showed at most multiple conspiracies that were more limited in membership or in duration, and that the district court erred in not instructing the jury that "[i]f you find that a particular defendant is a member of another or different conspiracy, not the one charged in the indictment, then you must acquit that defendant." Since if only one conspiracy has been alleged and proved the defendants are not entitled to a multiple conspiracy charge, *United States v. Ocampo, supra*, 650 F.2d at 429–30, and since the record reveals no proof that there was more than the one conspiracy alleged in the indictment, we find no error in the district court's refusal to give such an instruction.

---

**6.** The district court found alternatively that the search of Miller's apartment was justified by exigent circumstances. Such circumstances arose when Miller, upon his arrest, shouted to an unidentified woman on the street to get keys from his neighbor, go to his apartment, and "make sure nothing happens to the money." The court found that there were an insufficient number of DEA agents on the scene to guard Miller, safeguard Miller's car which had been seized and was to be impounded, and protect their own vehicles, and in addition to secure Miller's apartment, especially since they did not know how many means of ingress there might be. While such circumstances probably would have justified the agents' entry into Miller's apartment, *see United States v. Rubin*, 474 F.2d 262 (3d Cir.), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973), they would have authorized no more than a quick security check of the premises to make sure no person was present, and a posting of guards to be sure no person entered, to destroy evidence before authorization to search was obtained. The envelope at issue on this appeal was found inside the drawer of a night table. The search of the drawer would not have been necessary as part of a security check based on exigent circumstances, and the seizure of the envelope would not have been sustainable on that basis. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Vasquez, supra*, 638 F.2d at 532.

The essence of conspiracy, of course, is agreement, and in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal. *See generally United States v. Cambindo Valencia,* 609 F.2d 603, 621–29 (2d Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). Given the members' conscious participation in such a collective venture, a single conspiracy does not become multiple conspiracies merely because a particular member does not know the identities of some other members. *See, e. g., United States v. Gleason,* 616 F.2d 2, 16 (2d Cir. 1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *United States v. Paoli,* 603 F.2d 1029, 1035 (2d Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979); *United States v. Moten,* 564 F.2d 620, 624–26 (2d Cir.), *cert. denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304, 434 U.S. 959, 434 U.S. 974, 98 S.Ct. 531, 54 L.Ed.2d 466 (1977); *United States v. Taylor,* 562 F.2d 1345, 1351 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083, 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977); *United States v. Bynum,* 485 F.2d 490, 495–96 (2d Cir. 1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). Nor does a single conspiracy become multiple merely because a long period of time is spanned. *E. g., United States v. Murray,* 618 F.2d 892, 902 (2d Cir. 1980) (six years); *United States v. Armedo-Sarmiento,* 545 F.2d 785, 789–90 (2d Cir. 1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977) (four years). As we have long recognized, in many narcotics distribution networks the ultimate retailers may not know the identities of those who supply their wholesaler, and the retailers' identities may be unknown to those suppliers; but all are well aware that they are participating in a collective venture:

> In more normal business ventures this would be described as a vertically integrated loose-knit combination. The point

of course is that each level of the operation depends upon the existence of the other, and the mutual interdependence of each is fully understood and appreciated by the other. . . . The fact that not all of the defendants may have known and worked directly with all of the others is not significant since it is clearly established that each knew from the scope of the operation that others were involved in the performance of functions vital to the success of the business.

*United States v. Bynum, supra,* 485 F.2d at 495–96; *United States v. Tramaglino,* 197 F.2d 928 (2d Cir.), *cert. denied,* 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952); *United States v. Bruno,* 105 F.2d 921 (2d Cir.), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939).

There was ample evidence in the present case that each defendant knew he was a member of a vertically integrated enterprise for the distribution of narcotics. Radice and Perry regularly supplied large quantities of heroin to Martino. The collaborative participation of all three in heroin deliveries by Martino to a customer was observed by law enforcement officials on two occasions in August 1980. The continuing nature of the operation was clear from the fact that Radice and Perry were in constant touch with Martino. In March 1980, for example, thirty-eight telephone calls were made from the residence of Radice and Perry to Martino's Bronx apartment; between March and August, seventy-five such calls were made. The evidence included transcripts of conversations between Perry and Martino in June 1980, during which Martino complained about the quality of heroin previously supplied him. The fact that Radice and Perry may not have known the identities of those to whom Martino resold the narcotics they supplied him does not suggest that they, the suppliers, were not part of the same enterprise as Martino's regular customers.

Likewise, the evidence showed that Despaigne was one of Martino's regular heroin customers, and that he was a supplier of cocaine who knew that Martino could ob-

tain cocaine from other sources when Despaigne was not available. There were eleven transcripted conversations between Martino and Despaigne in June 1980. During some of these conversations the two discussed Martino's sale of heroin to Despaigne. In one, Martino told Despaigne that he had had a customer for cocaine, but that since Martino was having trouble reaching Despaigne for reliable delivery, he had sent Torrioni to get the cocaine from another source. In August, Despaigne, who was observed on a number of occasions in the company of Martino, was mentioned several times by Martino as his supplier of cocaine. The fact that Despaigne may not have known that Radice and Perry supplied the heroin he bought from Martino, or that they were Martino's alternative source for cocaine, does not warrant an inference that he was part of a different enterprise.

In short, the evidence at trial established that "the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers." *United States v. Bruno, supra*, 105 F.2d at 922.

Perhaps recognizing the frailty of their criticisms of the conspiracy's alleged membership, the defendants appear to focus their multiple conspiracy argument less on the conspiracy's organizational reach than on its temporal scope. They argue in particular that the evidence showed, at most, one conspiracy in March to June of 1980 and another in August 1980. The factual linchpin of this contention is that on June 12, Martino, having become enraged at De-Felice's quibbling as to the quality of the heroin available, had ordered DeFelice to leave his apartment and not to return; De-Felice obeyed and did not renew contact with Martino until August 8. Defendants' conclusion that the conspiracy thus ended on June 12, however, does not follow from their premise. The fact that Martino had a falling-out with DeFelice, the government informant, did not mean that Martino's relationships with his suppliers and his regular customers were in any way altered.

The telephone contacts from Radice and Perry to Martino continued from March through August; the relationship between Martino and Despaigne spanned both periods. So far as appears from the evidence, the banishing of DeFelice did not cause Martino, his suppliers, and his regular customers to miss a single step in the conspiratorial gavotte.

Thus we conclude that the district court was correct in its view that the evidence did not present a sufficient basis for the jury to infer that there were two or more discrete conspiracies.

### E. Sufficiency of the Evidence against Miller and Torrioni

Miller and Torrioni contend that the evidence at trial was insufficient to prove that they were members of the conspiracy to distribute narcotics. Viewing the evidence, as we must, in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we reject their contentions.

#### 1. *Miller*

The evidence against Miller consisted largely of seventeen intercepted conversations recorded during the wiretap of Martino's telephone. Although coded language was used by the participants in these conversations, there was evidence that the conversations were narcotics-related (*see* note 3 *supra*). In one recorded conversation, for example, Miller asked Martino, "could it stand a 30 or whatever it is . . . ," a phrase Martino had explained generally to DeFelice as referring to the amount by which a given quantity of heroin could be expanded by the addition of diluents. When Miller was arrested, he denied ever having used the phrase "could it stand a 30. . . ."

Other conversations indicated that Miller was supplying large quantities of heroin every week or two to a customer in Philadelphia. Miller sometimes telephoned his Philadelphia connection from Martino's apartment, and during one such conversation Martino was heard in the background telling Miller that he would have to talk to

his heroin sources to make sure they could supply him for the sale to Miller and Miller's customers. Another conversation between Miller and Martino revealed that the two were quite concerned over a complaint from Miller's customers that heroin previously supplied them had been inordinately diluted; they did not want these customers to take their business elsewhere. In a later series of conversations Martino repeatedly expressed annoyance, apparently because he had gone to his suppliers with respect to a deal for which Miller or his customers did not show up.

We conclude that there was sufficient evidence against Miller for a reasonable jury to find that he was a member of the Martino conspiracy to distribute narcotics as alleged in the indictment.

### 2. Torrioni

The evidence against Torrioni included the testimony that Torrioni was present at DeFelice's first meeting with Martino at Martino's apartment, where there was in plain view on the living room table a large pile of cocaine, and where Martino delivered a packet of a white substance to LaCilento. In the days that followed, Torrioni told DeFelice that he was a runner for Martino and that Martino gave him gold jewelry in return for his services. On the day that Torrioni made this statement, DeFelice observed him pour a small amount of what appeared to be cocaine from an aspirin bottle into a piece of aluminum foil, and depart, telling Martino, "I'll bring the money back for it." Further, in certain of the intercepted telephone conversations Torrioni relayed messages to and from Martino, acting as his spokesman on some occasions; and in other conversations Torrioni was mentioned as one who fetched narcotics for Martino, and carried payments from Martino to his suppliers and to Martino from his customers.

Finally, at the time of his arrest, Torrioni had in his hand four playing cards. Playing cards are frequently used to cut narcotics, and the four held by Torrioni were found to have traces of cocaine on them. When Torrioni was arrested he tried to throw them away.

In all, there was sufficient evidence from which a reasonable jury could find that Torrioni was a full and knowing member of the conspiracy to distribute narcotics.

### CONCLUSION

The judgments appealed from are affirmed.

OAKES, Circuit Judge (concurring):

I concur in the judgment of the court and in the language and reasoning of the entire opinion, except that portion (paragraph II B(1)) dealing with the entry into Martino's yard and seizure of the brown paper bag of heroin on the chair under the telephone book. I write more in the spirit of inquiry than of disagreement with the majority's view, though I place a little more emphasis on the limitations of the degree of "privacy" that Martino might expect under the circumstances and a little less on the exigencies of the circumstances involved, which from a law enforcement officer's standpoint were surely as exigent as circumstances can be.

Thus I start, as I believe the majority does, with the proposition that this case is one which concerns the very limited situation in which the law enforcement officer(s) involved had no real opportunity to obtain a warrant, so that nothing I say bears upon the more usual case where only delay is involved in the obtaining of a warrant. But I have trouble with the concept that "exigent circumstances" alone can justify warrantless searches, and I do not read the majority opinion as saying that they do. To the individual law enforcement officer, the circumstances for a warrantless search and seizure always appear exigent. And I do not read any Supreme Court case as going so far as to hold that there is a categorical exception for "exigent circumstances," although some cases do refer to that phrase, see, e. g., New York v. Belton, —— U.S. ——, ——, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981); Payton v. New York, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980).

A case like this one, as the majority recognizes, is not readily soluble by examination of the property rights in the invaded place. Prior to *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), Martino's backyard would have been considered "curtilage" entitled to some Fourth Amendment protection, *see, e. g., Care v. United States*, 231 F.2d 22, 25 (10th Cir.), *cert. denied*, 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461 (1956). In an urban setting "curtilage" was treated more or less as coextensive with a fenced yard, *e. g., Weaver v. United States*, 295 F.2d 360 (5th Cir. 1961); *Hobson v. United States*, 226 F.2d 890, 894 (8th Cir. 1955), but the fact that the gate was open and that the type of fence opened the yard to public view in this case would—even under the old analysis— have cut the other way. *See Polk v. United States*, 291 F.2d 230, 232 (9th Cir. 1961), *aff'd after remand*, 314 F.2d 837 (9th Cir.), *cert. denied*, 375 U.S. 844, 84 S.Ct. 96, 11 L.Ed.2d 72 (1963).

Since *Katz v. United States* and its reinforcement by, and perhaps expansion in, *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), both standing and the substantive scope of the Fourth Amendment are said to depend "not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. at 430. *See also Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). But just as, in Judge Henry Friendly's words, "[t]erming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis," *United States v. Arboleda*, 633 F.2d 985, 992 (2d Cir. 1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981), the problem with the "expectation of privacy" approach—the "expectation" language of which was taken from Justice Harlan's concurring opinion, the validity of which he subsequently came to doubt, *see United States v. White*, 401 U.S. 745, 786, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting)—is that the *Katz* formulation

also "can, ultimately, lead to the substitution of words for analysis," *id.* As Professor Amsterdam teaches us, even while lauding the thrust of *Katz* as expanding rather than reconstructing the boundaries of Fourth Amendment protection, "[i]n the end, the basis of the *Katz* decision seems to be that the fourth amendment protects those interests that may justifiably claim fourth amendment protection." Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 385 (1974). Of course, as he adds, "this begs the question." *Id.*

In other contexts I have indicated, and this court has held, that Professor Amsterdam's "regulatory" approach to the Fourth Amendment, requiring police rule-making so as to "confine police discretion within reasonable bounds," *id.* at 416, may make good sense. *See United States v. Vasquez*, 612 F.2d 1338, 1348 (2d Cir. 1979) (Oakes, J., dissenting) (airport search), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *United States v. Barbera*, 514 F.2d 294 (2d Cir. 1975) (border search). Even if the Supreme Court were inclined to take this approach, however, which it has shown little sign of doing, *but see Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979), it would be very difficult to devise a set of police rules that would cover the situation in the case at hand. Legal rules in such a case have a certain practical irrelevancy that brings to mind Michael Meltsner's observation that "no one feels so irrelevant as a lawyer in a shoot-out." *See* Amsterdam, *supra*, 58 Minn.L.Rev. at 378 (quoting M. Meltsner, Cruel & Unusual 36 (1973)). Perhaps this is what the Supreme Court is driving at in its references to "exigent circumstances"—the case is not amenable to pre-conceived rules.

In the situation then that is aided neither by the simplistic curtilage analysis of yesteryear nor by the *Katz-Rakas* "expectation of privacy" approach, nor even by Professor Amsterdam's regulatory approach—which in many cases I would enthusiastically endorse—our task is to determine whether the search and seizure was unreasonable under

880

the circumstances, at least when, as here, the officer had probable cause to believe that the premises contained not merely evidence but contraband. This process involves, it seems to me, a balancing. We must look at the area involved, the degree of governmental intrusion, the degree of the property owner's expectation of privacy, and the circumstances requiring immediate reaction by the officer.

Martino's expectations of privacy were greatly diminished here, if present at all. Not only was the heroin left in a chair in a yard with the gate open and the chair visible through the fence, but Martino had invited DeFelice, the confidential informant, to the yard "for the specific purpose of executing a felonious sale of narcotics," *Lewis v. United States*, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966).[1] Martino's backyard had thereby been "converted into a commercial center to which [an] outsider[ ] [was] invited for purposes of transacting unlawful business," *id.* at 211, 87 S.Ct. at 427. Thus, had DeFelice been a government agent, he could have removed the heroin after the arrest. *Id.* at 210–11, 87 S.Ct. at 427. *See also Boyd v. United States*, 116 U.S. 616, 623–24, 6 S.Ct. 524, 528–29, 29 L.Ed. 746 (1886) (a search for and seizure of contraband is different from a search to obtain information); 21 U.S.C. § 881(a) (there is no property interest in controlled substances). As an informant, DeFelice may, I believe, be considered to have been acting as a government agent, *see United States v. Valencia*, 645 F.2d 1158, 1168–69 (2d Cir. 1980) (an informant is treated as an agent for entrapment purposes); what is sauce for the goose is sauce for the gander. In any event, agent Toal was simply following in DeFelice's footsteps, if not in his shoes.

Moreover, agent Toal not only had probable cause to believe the heroin was where he found it, but the fast-developing situation precluded resort to a magistrate. This is, I believe, the underlying basis for the

"automobile exception" cases such as *United States v. Mannino*, 635 F.2d 110, 115 (2d Cir. 1980). That those cases involve vehicles that can be moved makes them none the less applicable in the balancing approach I favor here, where the heroin could as easily have been moved. To my mind, the "automobile exception," involving an underlying element of ready moveability absent which the "exception" is inapplicable, *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), may be viewed less mechanically as involving an underlying balancing such as I think is involved in this case.

I would conclude that, given the agents' probable cause and the fact that the heroin was seized immediately following the arrest of Martino, it was not unreasonable under the Fourth Amendment for agent Toal to enter the yard to seize the brown paper bag in light of the following circumstances: (a) the bag was reasonably believed to contain contraband—a vast quantity of heroin; (b) the transaction had been interrupted by an arrest made necessary because there was so much money involved that the government was properly unwilling to entrust it to the informant or turn it over to the culprit; and (c) the seller's expectation of privacy had been so greatly diminished as to be, if not *de minimis*, slight.

The Fourth Amendment itself speaks in terms of "unreasonable searches and seizures," of course, and the Supreme Court has reminded us, albeit in a case involving a warrant (although it also involved contraband), that there are some cases turning simply on "applying the ultimate standard of reasonableness embodied in the Fourth Amendment." *Michigan v. Summers*, 452 U.S. 692, 700 & nn. 11–12, 101 S.Ct. 2587, 2592–93 & nn. 11–12, 69 L.Ed.2d 340 (1981). Here, where there was clearly and concededly probable cause, I have little difficulty in concluding that the warrantless search and seizure was, on balance, reasonable. I make this inquiry uncertain that my

---

1. Justice Stewart cited *Lewis* with approval in his opinion for the Court in *Katz*, 389 U.S. at 351, 88 S.Ct. at 511.

method of reaching this result is the proper one; I believe we need further enlightenment from Higher Authority.