**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Levino MICHELENA–OROVIO, Defendant-Appellant.**

No. 81–3706.

United States Court of Appeals, Fifth Circuit.

Oct. 31, 1983.

Certiorari Denied March 19, 1984. See 104 S.Ct. 1605.

Dymond, Crull & Castaing, Edward J. Castaing, Jr., New Orleans, La., for defendant-appellant.

Marilyn Barnes, Michael Schatzow, Asst. U.S. Attys., New Orleans, La., Mervyn Hamburg, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, BROWN, WISDOM, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WIL-

LIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

RANDALL, Circuit Judge:

The defendant, Levino Michelena-Orovio, was convicted of conspiracy to import marijuana in violation of 21 U.S.C. § 963 (1976),[1] and conspiracy to possess marijuana with intent to distribute it in violation of 21 U.S.C. § 846 (1976).[2] We agreed to rehear this case en banc, 706 F.2d 502, in order to resolve a conflict in the decisions of this court with respect to whether the evidence that a crewmember on board a foreign vessel intercepted on the high seas has conspired to import a large quantity of marijuana into the United States is also sufficient to support that crewmember's conviction of conspiracy to possess the marijuana with intent to distribute it. We now hold that the government's evidence was sufficient to support the defendant's convictions of both conspiracy to import marijuana and conspiracy to possess it with intent to distribute it. Therefore, the defendant's conviction on both counts is affirmed.

The panel opinion fully states the conclusions of this court with respect to the other issues raised by the defendant in his appeal: (1) whether the district court erred in denying the defendant's motion to suppress the evidence, and (2) whether the district court erred in refusing to allow the jury to smell the sample bale of marijuana. Accordingly,

---

1. Section 963 provides:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 21 U.S.C. § 963 (1976). The substantive offense of importation is set forth in § 952(a):
 (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter.
 21 U.S.C. § 952(a) (1976).

2. Section 846 provides:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 21 U.S.C. § 846 (1976). The substantive offense of possession with intent to distribute is set forth in § 841(a)(1):
 (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.
 21 U.S.C. § 841(a)(1) (1976).

we reinstate parts II and III of the panel opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

An undercover agent joined other law enforcement agents in Louisiana in pretending to be unloaders and truckers of marijuana who were seeking employment. They met with persons who represented themselves to be engaged in smuggling marijuana from Colombia. These smugglers hired the agents to provide ships to meet at sea with other ships transporting marijuana and to aid in unloading the cargo from the additional vessels and in the storing of the cargo on shore in Louisiana.

The smugglers informed the undercover agents that a mother ship had departed from Colombia. The agents passed their information on to Coast Guard personnel. They described the ship to the Coast Guard as a converted shrimp boat, approximately seventy-five feet long, with a white hull, its booms removed, and a cargo of marijuana. They informed the Coast Guard that the ship was traveling from Colombia to rendezvous with another vessel at a specific point on the high seas and to unload the marijuana for importation into the United States. The agents' information proved to be correct. Forty or fifty miles south of the rendezvous point, personnel aboard the Coast Guard vessel, VALIANT, sighted a boat that met the agents' description. The boat was heading north toward the rendezvous site.

As the VALIANT neared the vessel, the VALIANT crew was able to identify the vessel as the ALEX LUZ. The lights on the vessel had been reversed so that it appeared to be moving in the direction opposite to its actual course. The ALEX LUZ, presumably after it sighted the VALIANT, changed its course radically from due north to due south. After the VALIANT unsuccessfully attempted to communicate with the ALEX LUZ by radio, it came alongside the vessel and requested permission to board, which was denied.

Since the ALEX LUZ was flying the Venezuelan flag, the personnel on the VALIANT obtained permission to board from the Venezuelan government, as well as permission to search the vessel and detain it if marijuana or contraband were found. The VALIANT then attempted to communicate by radio with the ALEX LUZ, but received no response. Finally, the VALIANT crew told the ALEX LUZ to stop because the Coast Guard had permission to board the vessel.

When the ALEX LUZ did not stop, the VALIANT crew made several attempts to force a halt, including firing shots into the air and throwing lines into the propeller. After the Coast Guard hosed the vessel, sending water into its smokestack, the boat finally came to a stop. Eight Colombians, including the defendant, came out of the cabin with their bags packed and sat on the stern of the vessel.

There was apparently no marijuana on the deck of the ALEX LUZ, but Lieutenant Shuck testified at trial that he could smell marijuana when he boarded the vessel. When Lieutenant Shuck asked for the captain of the ALEX LUZ, Oscar Romero, one of the persons aboard who had previously spoken with the Coast Guard crew, responded that there was no captain and that the boat had no official papers. The Coast Guard found 363 bales of marijuana in the hold of the vessel. Government witnesses valued the marijuana at approximately four to six million dollars.

On September 25, 1981, Michelena-Orovio and others were charged in a three-count superseding indictment with conspiracy to import marijuana into the United States, attempting to import marijuana into the United States and conspiracy to possess marijuana with intent to distribute it, in violation of 21 U.S.C. §§ 963, and 846 (1976), respectively. At trial, Michelena-Orovio contended that the government had not proven his knowledge or participation in either conspiracy. He argued to the jury and to the court that the government's evidence showed nothing more than his presence on board a vessel loaded with a large

quantity of marijuana. The jury apparently rejected this argument since it convicted him on both counts. The court then sentenced the defendant to a four-year term of imprisonment on the first conspiracy count and a five-year term on the second. Imposition of sentence on the latter count was suspended and the defendant was placed on inactive probation for five years, to commence upon his release from custody. The government's subsequent motion to dismiss the substantive count of the indictment was granted. Michelena-Orovio timely appealed.

The panel that originally heard Michelena-Orovio's appeal was unanimous in its view that the government's evidence was "more than sufficient" to establish his guilt of conspiracy to import marijuana into the United States, in violation of 21 U.S.C. § 963. *United States v. Michelena-Orovio,* 702 F.2d 496, 500 (5th Cir.1983). The panel found itself confronted with two distinct lines of precedent, however, with respect to whether the evidence was also sufficient to support Michelena-Orovio's conviction of conspiracy to possess marijuana with intent to distribute it, in violation of 21 U.S.C. § 846. One line of cases held that once the jury had determined that the defendant was involved in the conspiracy to import contraband, it was entitled to conclude that the defendant was also a participant in the conspiracy to distribute on the basis of the quantity of marijuana imported. *See, e.g., United States v. Mazyak,* 650 F.2d 788 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *United States v. Mann,* 615 F.2d 668 (5th Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). Two other cases had held that participation in the conspiracy to distribute *could not* be inferred solely from participation in the conspiracy to import a large quantity of marijuana. *United States v. Cadena,* 585 F.2d 1252 (5th Cir.1978); *United States v. Rodriguez,* 585 F.2d 1234 (5th Cir.), *aff'd,* 612 F.2d 906 (en banc), *aff'd sub nom. Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275

(1981). The panel majority chose to resolve this conflict by following *Cadena,* while the dissent found the other line of cases more persuasive.

## II. THE SUFFICIENCY OF THE EVIDENCE.

■ The standard of review of the sufficiency of the evidence in a criminal case is whether a "reasonable trier of fact could [have found] that the evidence establishe[d] guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[3] In evaluating a claim of insufficient evidence according to this standard, we must consider the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Freeman,* 660 F.2d 1030, 1034 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982). In a conspiracy case, the government must prove beyond a reasonable doubt "that a conspiracy existed, that the accused knew about it and, with that knowledge, voluntarily joined it." *United States v. Rodriguez,* 585 F.2d 1234, 1245 (5th Cir.) (quoting *United States v. White,* 569 F.2d 263, 267 (5th Cir.1978)), *aff'd,* 612 F.2d 906 (5th Cir.1978) (en banc), *aff'd sub nom. Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). In a conspiracy prosecution under 21 U.S.C. § 963 or 21 U.S.C. § 846, there is no need to allege or prove overt acts, *Rodriguez,* 585 F.2d at 1245, *aff'd,* 612 F.2d at 919 n. 37, or to produce direct evidence of the conspiracy. *Glasser, supra.* Further, the government is "not required to prove ... knowledge of all the details of the conspiracy or each of its members, provided that [the] prosecution established his knowledge of the essential[s] of the conspiracy." *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981) (citation omitted).

---

**3.** The significance of the standard of review set forth in *Bell* is discussed *infra,* at note 4.

## A. Conspiracy to Import.

█ Relying on the factors set forth in *United States v. Alfrey,* 620 F.2d 551, 556 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980) (the length of the voyage, the quantity of contraband on board, and the relationship between captain and crew), the panel upheld Michelena-Orovio's conviction of conspiracy to import marijuana. We agree with the panel's conclusion that the government established more than the defendant's mere presence on board the ALEX LUZ, *see United States v. Bland,* 653 F.2d 989, 996–97 (5th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); *United States v. Willis,* 639 F.2d 1335, 1338–39 (5th Cir.1981), and that there was ample evidence to support the defendant's conviction on the importation count.

In particular, we note that Michelena-Orovio was arrested on board a small vessel that had just completed a relatively lengthy voyage from Colombia. The boat was laden with twelve tons of marijuana and reeked of its illicit cargo. Although the boat was a shrimping vessel, there was no fishing equipment aboard and no cargo other than the contraband. The marijuana was found in the ship's cargo hold. The cargo hatch was neither locked nor fastened, and there was open access to the cargo hold from the engine room of the vessel.

The ship's crew, including Michelena-Orovio, engaged in a concerted endeavor to elude capture and protect each other. When the Coast Guard first spotted the vessel, it had its lights reversed so that it appeared to be going in the direction opposite to its actual course, apparently in the hope that it would escape detection. The boat changed direction as soon as its crew became aware of the Coast Guard's presence. When the agents came on board, all eight crew members were waiting on deck with their bags packed, and all eight insisted that there was no captain aboard the vessel.

We are satisfied that a reasonable jury could have found Michelena-Orovio guilty beyond a reasonable doubt of conspiracy to import marijuana on the basis of this evidence. We turn then to our consideration of whether the evidence was also sufficient to support his conviction of conspiracy to possess the marijuana with intent to distribute it.

## B. The Conspiracy to Possess with Intent to Distribute.

### 1. Conflict In the Circuit.[4]

█ In setting aside Michelena-Orovio's conviction of conspiracy to possess marijua-

---

4. As stated above, this court recently set forth the standard of review for the sufficiency of the evidence of a criminal defendant's guilt:

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982), *aff'd,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983) (footnote omitted). We note that *Bell,* which was decided on June 1, 1982, changed the statement of the standard of review for the sufficiency of the evidence in this circuit. In *Bell,* we rejected an earlier statement of the test that required an acquittal unless the evidence "exclude[d] every reasonable hypothesis of innocence." *Bell,* 678 F.2d at 549; *see also id.* at n. 3 (quoting *Kassin v. United States,* 87 F.2d 183, 184 (5th Cir.1937) (acquittal required unless circumstantial evidence was "inconsistent with every reasonable hypothesis of innocence")). We concluded that the difference between the two tests was "not merely semantic," and specifically adopted the *Bell* test "as the more precise statement of the law." *Id.* at 549 n. 3.

Most of the conspiracy cases that have resulted in a conflict in this circuit were decided before our decision in *Bell.* The pre-*Bell* test arguably invited the kind of speculation about what the evidence could have shown that the *Cadena* and *Rodriguez* panel engaged in. On the other hand, the *Mann* line of cases was also decided before *Bell.* The court in those cases presumably concluded that the hypothesis that the importer of a large quantity of marijuana was unaware of and unconcerned about the plans for its distribution was unreasonable and thus that this hypothesis did not require an acquittal even under the old test. Therefore, the present conflict in the circuit cannot be explained on the ground that the courts were applying different tests. Of course, under *Bell,*

na with intent to distribute it, the panel majority chose to follow *United States v. Cadena,* 585 F.2d 1252 (5th Cir.1978), and *United States v. Rodriguez,* 585 F.2d 1234, 1247 (5th Cir.1978), *aff'd,* 612 F.2d 906, 908 n. 3 (5th Cir.1980) (en banc), *aff'd sub nom. Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).[5] In *Cadena,* we reversed the conviction of the captain of a mother ship that had transferred a large quantity of marijuana to a smaller craft 200 miles south of the Florida coast. We noted:

> Unlike the situation presented by an ongoing enterprise, Cadena had no interest in or awareness of what plans, if any, had been reached to dispose of the marijuana once he reached these shores. Although a conspiracy to import facilitates a conspiracy to distribute, one cannot joint [sic] a conspiracy, whether by conduct or verbal accord, unless one knows that it has in fact been concocted.... [F]rom Cadena's perspective, it was not apparent that any accord had yet been reached, either tacitly or otherwise.

585 F.2d at 1266. *Rodriguez* involved the prosecution of the four people who were to receive the marijuana which was on Cadena's boat. While we affirmed the convictions of conspiracy to possess with intent to distribute of two of the defendants in that case, we reversed the convictions of the two men who had not specifically made arrangements to participate in the distribution of the marijuana:

> However, there was literally no evidence with respect to the involvement of Martins and Smigowski in a distribution scheme except what might be inferred from their participation in an agreement to import it. The direct and circumstantial evidence that they were peripheral participants in the importation scheme does not refute, beyond a reasonable doubt, the hypothesis that they had no

knowledge of a conspiracy to distribute once it reached these shores.

> Unlike Rodriguez and Albernaz, who perforce had to make some arrangements to dispose of their treasure, Smigowski and Martins could each receive his reward and be done with the scheme. Unlike Rodriguez and Albernaz, who, according to the evidence, had contacts outside the Miami area, needed front money, and planned to use Winnebagos, Smigowski or Martins were not shown to have been connected with the actual arrangements for importation.

> There was evidence that Smigowski and Martins were parties to the importation scheme, but there is no evidence that would establish beyond reasonable doubt that they would likely come in possession of the haul once it arrived, share in its proceeds thereafter, or other evidence from which it could in turn be inferred that they were privy to plans to distribute the contraband. We have already noted that possession of a large supply of a prohibited substance may justify the inference that the possessor intended to distribute it, but there was no evidence that Smigowski and Martins had sufficient dominion over or interest in the marijuana to warrant the inference.

585 F.2d at 1247 (affirmed in pertinent part, 612 F.2d at 908–09 n. 3). The panel majority was convinced that the evidence in Michelena-Orovio's case, like the evidence in *Cadena* and *Rodriguez,* showed only the defendant's participation in the importation scheme, but not his participation in the distribution scheme.

Relying on a long line of Fifth Circuit cases that had held that the jury may infer intent to distribute the contraband from the size of the cache, the panel dissent argued that Michelena-Orovio's conviction on the second count should be affirmed. The dissent noted that while *Cadena* and *Rodri-*

---

we are not invited to engage in speculation about what the defendant's state of mind may have been; we must affirm the defendant's conviction as long as the jury's construction of the evidence as supporting the defendant's guilt beyond a reasonable doubt was reasonable.

**5.** In *Albernaz, supra,* the Supreme Court considered only the double jeopardy question posed by *Rodriguez.*

*guez* had never been specifically abandoned, they appeared to have been overruled *sub silentio,* since there had been no case that had followed either precedent for the proposition that the amount of contraband imported cannot be the sole basis for connecting a defendant to an existing conspiracy to distribute. The cases had either attempted to distinguish *Cadena, see United States v. Chaparro-Almeida,* 679 F.2d 423 (5th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 801, 74 L.Ed.2d 1004 (1983) (convictions affirmed where marijuana-laden vessel was stopped within seven miles of the Louisiana coast while boat was waiting to deliver marijuana to two Americans), or ignored it completely. *See United States v. Borchardt,* 698 F.2d 697 (5th Cir.1983) (affirming convictions of conspiracies to import and to possess with intent to distribute, and substantive offenses, of person who arranged importation of 481 pounds of marijuana from Mexico); *United States v. Scott,* 678 F.2d 606 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 304, 74 L.Ed.2d 285 (1982) (affirming convictions of conspiracy to import and to possess with intent to distribute of some persons found on pleasure boat that contained 30,000 pounds of marijuana, but reversing convictions of those defendants not shown to have knowledge of the cargo); *United States v. Escobar,* 674 F.2d 469 (5th Cir.1982) (affirming convictions of crew—and captain—on shrimp boat, where the boat had left a foreign port with at least four tons of marijuana and docked in Mississippi without it); *United States v. Hernandez,* 668 F.2d 824 (5th Cir.1982) (affirming conviction of person who got off of a boat that contained thirteen bales of marijuana and five boxes of methaqualone tablets, where he had keys to the cabin where the contraband was kept and had a station wagon on land waiting to transport the boat); *United States v. Mazyak,* 650 F.2d 788 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982) (affirming convictions of captain and crew found on forty-two foot trawler laden with 14,611 pounds of marijuana; the trawler had left Miami nineteen days before it was stopped seventy miles south of Cuba); *United States v. Jonas,* 639 F.2d 200 (5th Cir.1981) (affirming convictions of conspiracies to import and to possess of persons found on board boat laden with over 27,000 pounds of marijuana sixty to eighty miles from Florida Keys); *United States v. Shelnut,* 625 F.2d 59 (5th Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818 (1981) (citing *United States v. Love,* 599 F.2d 107 (5th Cir.), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979)) (affirming convictions of defendants who were found on a shrimping vessel headed toward Texas, where the boat contained no shrimping equipment or shrimp, but did contain fifteen tons of marijuana). Other cases had cited *Rodriguez* for the contrary proposition, i.e., that participation in the conspiracy to possess with intent to distribute may be inferred from the size of the cache. In *Mann, supra,* we held:

> The defendants were apprehended with over 22,500 pounds of marijuana in their possession, far too much for the personal consumption of four individuals. Having determined that defendants planned to import their cargo, the jury was entitled to infer from the facts before it that some plan had been made for its disposition. As we have previously noted "[t]he very size of a ... cache can be sufficient to show intent to distribute...." *United States v. Rodriguez,* 585 F.2d 1234, 1246 (5th Cir.1978), *aff'd* 612 F.2d 906 (5th Cir.1980) (en banc).

615 F.2d at 670 (other citations omitted); *see also United States v. Perez,* 648 F.2d 219 (5th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981) (citing *Mann*'s citation of *Rodriguez* in affirming convictions of conspiracy to possess with intent to distribute, where agents watched defendants unload 18,900 pounds of marijuana onto a conveyor belt behind a Florida beach house).[6]

---

6. A number of cases had also held that a jury could infer intent to distribute from the size of the cache before *Cadena* and *Rodriguez* were decided. *See, e.g., United States v. Cortez,* 521 F.2d 1, 4 (5th Cir.1975) (affirming conviction on one count of conspiracy to import and to pos-

We are now confronted with a situation often encountered in the law: for a number of years, reasonable people have disagreed about whether a reasonable jury must necessarily have entertained a reasonable doubt about a man's guilt. In this case, the question is whether the jury, having reasonably determined that the defendant is guilty of conspiracy to import twelve tons of marijuana, was entitled to infer from the size of the cargo the defendant's knowledge of and participation in the scheme for its distribution.

### 2. Narcotics Conspiracies: Has the Chain Been Broken?

Conspiracies to distribute narcotics [7] have generally been considered to be prime examples of chain, or interconnected, conspiracies, in which a participant in a segment of the conspiracy may be convicted of participation in the whole.[8] For example, in *United States v. Bruno*, 105 F.2d 921 (2d Cir.), *rev'd on other grounds*, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939), the defendants were indicted for and convicted of a conspiracy to import, sell and possess narcotics. They argued that there were at least three separate conspiracies—one between the smugglers and the middlemen and one between the middlemen and each group of retailers. The Court of Appeals for the Second Circuit rejected the defendants' argument, specifically recognizing the interdependence of participants in a drug distribution scheme:

> The evidence did not disclose any cooperation or communication between the smugglers and either group of retailers, or between the two groups of retailers themselves; however, the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole.

105 F.2d at 922.

The Second Circuit has followed the *Bruno* rationale in more recent narcotics cases under the present statute:

sess with intent to distribute of owner of automobile who was present at arrival of boat carrying 300 pounds of marijuana, and stating that distribution was established by the fact that it was "virtually impossible for two mere mortals to consume 300 pounds of marijuana, personally, within a reasonable span of time"); *United States v. Maslanka*, 501 F.2d 208 (5th Cir.1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (affirming convictions of conspiracy to possess with intent to distribute and possession of persons observed on a beach where 18,000 pounds of marijuana was floating, but reversing convictions of conspiracy to import and importation because there was not sufficient evidence that the contraband came from a foreign source); *see also United States v. Perry*, 480 F.2d 147 (5th Cir. 1973) (affirming conviction of substantive offense of possession with intent to distribute and holding that size of cache could support inference that contraband was not solely for personal use); *United States v. Mather*, 465 F.2d 1035 (5th Cir.), *cert. denied*, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972) (same).

7. The term "narcotics" is used in this opinion as a synonym for illegal drugs.

8. In *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the Supreme Court was confronted with a chain-type conspiracy to sell whiskey unlawfully. Affirming the defendants' convictions, the Court noted that "the several agreements [among the various participants] were essential and integral steps" in a single conspiracy. 332 U.S. at 559, 68 S.Ct. at 257. In contrast, where the conspiracy has taken a different form, for example, where the government's proof has established the spokes but not the rim of a wheel conspiracy, the Supreme Court has not hesitated to set aside the defendants' convictions. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (fatal variance between indictment charging one conspiracy and proof establishing several).

As we have long recognized, in many narcotics distribution networks the ultimate retailers may not know the identities of those who supply their wholesaler, and the retailers' identities may be unknown to those suppliers; but all are well aware that they are participating in a collective venture.

*United States v. Martino,* 664 F.2d 860, 876 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). In our own circuit we have stated:

Where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, or where the character of the property involved or the nature of the activity is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants, the existence of a single conspiracy will be inferred.

*United States v. Elam,* 678 F.2d 1234, 1246 (5th Cir.1982) (citations omitted).

The defendants in these chain-conspiracy cases claimed that the government had proved not one but several conspiracies, and that this variance between the indictment and the proof at trial rendered their convictions invalid. *Elam, supra; Bruno, supra.*[9] In each case, the defendants' claim was firmly rejected. We suspect that Michelena-Orovio would have suffered the same fate had he been charged with one count of conspiracy to import marijuana and to pos-

sess it with intent to distribute it, and had he subsequently attempted to challenge his conviction for participation in the entire conspiracy, since he too was a vital link in the distribution scheme. Successful implementation of his importation plan was dependent upon the availability of buyers and distributors for his cargo, while these buyers and distributors were dependent on Michelena-Orovio for a cargo to sell.[10]

The government was able to charge Michelena-Orovio with participation in two conspiracies because Congress enacted two conspiracy statutes when it revised the nation's drug laws in 1970. 21 U.S.C. §§ 963, 846. Congress' decision to enact two statutes should not be understood, however, to break the link between the importers and the distributors. While the legislative history of the Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801 *et seq.* (1976), is silent with respect to the precise issue before us, the history of the Act indicates that Congress did not intend to limit the scope of the drug-smuggling conspiracy or conspiracies for which a defendant may be convicted.

In determining that the imposition of multiple punishments for participation in conspiracies to import and to possess was not a violation of the double jeopardy clause of the United States Constitution, a majority of this court noted that Congress, in its various enactments of drug control legislation over the past fifty years, had endeavored to "turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter." *Rodriguez, supra,* 612 F.2d at 916 (quoting *Gore*

---

**9.** In *Martino, supra,* the defendants claimed that the trial judge had erred in failing to give a multiple conspiracy instruction to the jury.

**10.** *Bruno* and *Elam* involved challenges to the defendants' convictions on the ground that there was a fatal variance between the offense charged in the indictment and the government's proof at trial, rather than a challenge based on insufficiency of the evidence of the defendant's participation in any conspiracy. The analysis may be quite different in the two types of cases as the critical inquiry in a variance case is "whether there has been such a

variance as to 'affect the substantial rights of the accused.'" *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). On the other hand, the courts in the above-cited cases engaged in an inquiry similar to our own insofar as they held that there was no variance between the indictment charging a single conspiracy and the proof at trial, i.e., that the government had proved the interdependence of the participants in the distribution scheme. Nevertheless, the variance cases, while instructive, are not dispositive of the issue before us.

*v. United States,* 357 U.S. 386, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958)), *aff'd sub nom. Albernaz, supra,* 450 U.S. at 343, 101 S.Ct. at 1144. The 1970 Act was

> designed to deal in a comprehensive fashion with the growing menace of drug abuse in the United States ... through providing more effective means for law enforcement aspects of drug abuse prevention and control, and ... by providing for an overall balanced scheme of criminal penalties for offenses involving drugs.

H.R.Rep. No. 1444, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Ad.News 4566, 4567. The President's Advisory Commission on Narcotics and Drug Abuse reported: "The illegal traffic in drugs should be attacked with the full power of the Federal Government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive." *Id.* at 4575.

Were we to hold that Michelena-Orovio could be convicted only of conspiracy to import, he would be able to escape with a lesser penalty under the new law than he could have under the old. Under the old law, conspiracy to import or distribute marijuana carried a penalty of five to twenty years in prison and a $20,000 fine. 21 U.S.C. § 176(a) (1964) (repealed 1970). Conspiracy to import marijuana may now be punished with up to five years in prison and/or a $15,000 fine. 21 U.S.C. § 960(b)(2) (1976). Conspiracy to possess marijuana carries the same penalty, 21 U.S.C. § 841(b)(1)(B) (1976), but if the defendant conspires to possess more than 1000 pounds, he may be imprisoned for up to fifteen years and/or fined $125,000. 21 U.S.C. § 841(b)(6) (1976).[11] Thus, while the defendant could have received up to twenty years in prison plus a $20,000 fine (and was required to receive a minimum of five years) under the old statute, if he may be

convicted only of conspiracy to import under the new statute, his maximum penalty would be five years in prison, plus a $15,000 fine. This cannot be the result intended by a Congress intent on tightening the screws of the criminal machinery in an effort to combat drug abuse.

An understanding of congressional intent only begins our inquiry, however, for we must still determine whether the jury could reasonably have concluded that Michelena-Orovio knew of and participated in both the conspiracy to import the marijuana and the conspiracy to possess it with intent to distribute it. There need be no doubt in this case about the existence of a conspiracy to distribute the marijuana found on board the ALEX LUZ. The Coast Guard was able to apprehend the vessel and its crew because the Louisiana-based importers had informed undercover agents, who were posing as persons interested in aiding in the distribution of marijuana, that the ALEX LUZ was carrying a cargo of contraband for distribution in the United States. In fact, one of the importers informed the agents that he belonged to a marijuana-smuggling "organization," that this organization "had a lot of ships," and that if the agents who were posing as unloaders "could provide good service, [the organization] would bring ... a lot of shiploads of marijuana." Trial Transcript at 116 (Testimony of Agent Donald). The question in this case is whether Michelena-Orovio's knowledge of and participation in this distribution scheme may be inferred from his participation in the scheme to supply twelve tons of marijuana from Colombia.

On at least two occasions, the Supreme Court has assessed the culpability of a person who supplies goods to people who intend to use those goods unlawfully. Where the goods were "themselves innocent," the

---

**11.** The two conspiracy statutes, 21 U.S.C. §§ 963 and 846, provide that a person who has committed the offense of conspiracy is "punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the ... conspiracy." Section 960 provides the penalties for the sub-

stantive offense of importation, and § 841 provides the penalties for the substantive offense of possession with intent to distribute. Since marijuana is a non-narcotic, 21 U.S.C. § 802(16), schedule I drug, 21 U.S.C. § 812(c), Schedule I (c)(10), §§ 960(b)(2) and 841(b)(1), (3) establish the appropriate penalties.

Court held that the evidence was insufficient to support convictions of aiding and abetting a conspiracy of persons who knowingly supplied the goods to the conspirators. *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (evidence insufficient to support convictions of aiding and abetting a conspiracy to distill spirits of persons who knowingly supplied a large volume of sugar and yeast to illegal distillers). Where the defendant had supplied restricted narcotics, however, the Court was willing to infer the supplier's knowledge of and complicity in the illegal narcotics distribution scheme from the large quantity of narcotics sold over a prolonged period of time. *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943) (affirming conviction of drug manufacturer and wholesaler who had, over a period of years, supplied large amounts of morphine sulphate to a doctor who was distributing the drugs illegally). These cases are factually distinct from the case before us in that they involved an attempt to convict persons solely on the basis of their sale of goods to the conspirators, while the evidence in this case demonstrates that Michelena-Orovio was an actual participant in at least a segment of the distribution scheme since he was a member of the conspiracy to import the marijuana. Because Michelena-Orovio was a conspirator in at least a segment of the drug-smuggling conspiracy, the inference of his knowledge of and participation in the remainder of the distribution scheme is stronger than it might be were he a bystander who had simply sold his wares to the conspirator. The Supreme Court's discussion, however, of the relationship between the inference of knowledge of and participation in the illicit conspiracy and the nature of the item transferred is instructive with respect to whether the jury could reasonably have concluded that Michelena-Orovio was a member of the conspiracy to possess with intent to distribute the marijuana that he had conspired to import.

The Supreme Court recognized in *Direct Sales* that the strength of an inference of participation in the illicit conspiracy based on the sale of goods to the conspirators is dependent on the nature of the goods sold. Because the narcotics in *Direct Sales* were heavily regulated, there was a greater inference that the distributor knew that the doctor would use the goods illegally and that the distributor intended to further, promote, and cooperate in the doctor's misuse of the commodity:

> The commodities sold [in *Falcone*] were articles of free commerce, sugar, cans, etc. They were not restricted as to sale by order form, registration, or other requirements. When they left the seller's stock and passed to the purchaser's hands, they were not in themselves restricted commodities, incapable of further legal use except by compliance with rigid regulations, such as apply to morphine sulphate. The difference is like that between toy pistols or hunting-rifles and machine guns. All articles of commerce may be put to illegal ends. But all do not have inherently the same susceptibility to harmful and illegal use. Nor, by the same token, do all embody the same capacity, from their very nature, for giving the seller notice the buyer will use them unlawfully. Gangsters, not hunters or small boys, comprise the normal private market for machine guns. So drug addicts furnish the normal outlet for morphine which gets outside the restricted channels of legitimate trade.

319 U.S. at 710–11, 63 S.Ct. at 1268–69. The Court explained that the difference in commodities was important in terms of both the seller's *knowledge* of the buyer's intended use, and the seller's *intent* to promote and cooperate in the illegal action:

> This difference is important for two purposes. One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further, promote and cooperate in it.

*Id.* In recognition of the obvious difference between the sale of morphine and the sale of sugar, yeast and cans, the Court went on to state that the quantum of proof required to show knowledge that the buyer will use

the commodity unlawfully is dependent upon the nature of the commodity:

> The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arising from the latters' inherent capacity for harm and from the very fact they are restricted, makes a difference in the quantity of proof required to show knowledge that the buyer will utilize the article unlawfully. Additional facts, such as quantity sales, high-pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise. Knowledge, equivocal and uncertain as to one, becomes sure as to the other. So far as knowledge is the foundation of intent, the latter thereby also becomes the more secure.

*Id.* at 711–12, 63 S.Ct. at 1269.

The panel majority reviewing Michelena-Orovio's appeal emphasized that in *Direct Sales* there had been prolonged cooperation between the wholesale supplier and the physician who was engaging in the illicit enterprise, while the evidence at Michelena-Orovio's trial disclosed only his participation in this single importation incident.[12] The majority reasoned that where there is prolonged cooperation, the seller may have a "stake" in the successful outcome of the entire scheme, *Michelena-Orovio,* 702 F.2d at 505, but where there is nothing more than a "single or casual transaction," the supplier may be indifferent to the buyer's illicit purpose. *Id.* at 506 (quoting *Direct Sales,* 319 U.S. at 712 n. 8, 63 S.Ct. at 1269 n. 8). The panel majority failed to recognize that Michelena-Orovio was not just a supplier of goods to the conspirators; he was himself a member of a segment of an extensive conspiracy to obtain marijuana and to distribute it in the United States. Further, we do not read the *Direct Sales* Court's decision affirming the supplier's conviction as narrowly as the panel majority did.

*Falcone* and *Direct Sales* must be viewed along a continuum of sales of goods to persons engaged in an unlawful conspiracy. At one end of the continuum is *Falcone,* which did not involve an inherently illegal transaction at all, but rather the sale of goods "in themselves innocent." 311 U.S. at 207, 61 S.Ct. at 205 (quoting the opinion below, 109 F.2d 579, 581 (2d Cir.1940)).[13] The sale of morphine in *Direct Sales* fell somewhere in the middle of the continuum, in that it involved the sale of a restricted commodity. Thus, "not every instance of

---

**12.** In an attempt to counter the defendant's claims that he had no knowledge of the nature of the cargo, the government requested permission to introduce testimony that Michelena-Orovio had been arrested on board a second boat that was laden with over 30,000 pounds of marijuana shortly after his adventures aboard the ALEX LUZ. The court denied the request. Trial Transcript at 184–95.

**13.** The Second Circuit has subsequently limited *Falcone* to its facts:

> The defendants invoke our decision in *United States v. Falcone,* 2 Cir., 109 F.2d 579, for the proposition that a mere supplier, even one who knows of the illegal purpose of his purchaser, cannot be held as a co-conspirator. We have limited that case to its strict facts—the case of a supplier of goods, innocent in themselves, who does nothing but sell those goods to a purchaser who, to the supplier's knowledge, intends to and does use

them in the furtherance of an illegal conspiracy. The suppliers here did more than just sell. They aided and abetted the conspiracy by themselves making illegal sales; for their sales were not on the basis of the proper forms or pursuant to written orders of the type required by 26 U.S.C. § 2591(a) for marihuana transfers. As these sales were illegal and clandestine, each supplier, through them, became himself a part of the conspiracy for their intended resale; this added element of personal lawbreaking and clandestine selling furnished the required "stake in the success of the venture" that the Falcone case demanded.

*United States v. Tramaglino,* 197 F.2d 928, 930–31 (2d Cir.), *cert. denied,* 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952). Thus, the Second Circuit has held that the defendant's participation in an illegal sale may provide the requisite stake in the venture.

sale of restricted goods" would support a charge of conspiracy. 319 U.S. at 712, 63 S.Ct. at 1269. But the restricted nature of the commodity meant that there were limitations on the possible expansion of the legal market:

> [T]he market for opiates may [not] be developed as any other market.... Mass advertising and bargain-counter discounts are not appropriate to commodities so surrounded with restrictions. They do not create new legal demand and new classes of legitimate patrons, as they do for sugar, tobacco and other free commodities. Beyond narrow limits, the normal legal market for opiates is not capable of being extended by such methods. The primary effect is rather to create black markets for dope and to increase illegal demand and consumption.

*Id.* In the case of *Direct Sales,* the sale of large quantities of morphine, together with the prolonged cooperation between the seller and buyer, provided the evidence sufficient to convict the seller of conspiracy to violate the narcotics laws.

If *Falcone* is at one end of the continuum, Michelena-Orovio's case is at the other, for the transaction involving the marijuana was itself illegal and there was no legal market for the commodity. The absence of any legal market provides an additional link that supports the inference of the illegal importer's involvement in the conspiracy to possess his cargo with intent to distribute it. Michelena-Orovio would have had no job if there had been no plan made for the distribution of his cargo, and the twelve tons of marijuana would have been virtually worthless if there had been no conspiracy to distribute. The marijuana could not be sold in the supermarket as sugar or yeast could, *Falcone,* nor could it be disposed of in a pharmacy or hospital, as morphine might be. *Direct Sales.*[14] As we recognized in *Mann, supra,* common sense leads to the conclusion that an importer of that much marijuana knows perfectly well, and indeed

relies on the fact, that there is a plan for the distribution of his cargo. *See Turner v. United States,* 396 U.S. 398, 417, 90 S.Ct. 642, 652, 24 L.Ed.2d 610 (1970) ("Common sense ... tells us that those who traffic in heroin will inevitably become aware that the product they deal in is smuggled, unless they practice a studied ignorance to which they are not entitled."); *Barnes v. United States,* 412 U.S. 837, 845, 93 S.Ct. 2357, 2362, 37 L.Ed.2d 380 (1973) (affirming conviction of possession of United States Treasury checks stolen from the mails where knowledge that the checks were stolen was inferred from unexplained possession of checks made out to someone with whom the defendant was unacquainted).

Where a single act itself is one from which knowledge and participation may be inferred, the courts have not hesitated in upholding a defendant's conviction. *See United States v. Bobo,* 586 F.2d 355, 370 n. 20 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979) (affirming conviction of defendant who accompanied conspirator only once, where half pound of uncut heroin was obtained and cut to produce an even greater quantity); *United States v. Magnano,* 543 F.2d 431, 434–35 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977) (affirming convictions where "single acts"—sales of five and three kilos of pure heroin—were to core members of conspiracy and of "such a magnitude as to justify an inference that each knew he was involved in a criminal enterprise of substantial scope"). Michelena-Orovio's attempted importation of a huge quantity of marijuana is such an act. The importation of twelve tons of marijuana with an approximate street value of between four to six million dollars is not readily characterized as a "casual" transaction, even if the transaction is planned for one time only.

Contrasting Captain Cadena's situation with the "situation presented by an ongoing enterprise," the *Cadena* court surmised that

---

14. While the medical community has been experimenting with marijuana in treating a number of ailments, that community can hardly be said to provide a demand for twelve tons of foreign marijuana.

the captain "had no interest in or awareness of what plans, if any, had been reached to dispose of the marijuana once he reached these shores." 585 F.2d at 1266. The facts of the case before us demonstrate the fallacy in this reasoning. According to Agent Donald's testimony, the conspiracy to distribute the marijuana came into existence long before Michelena-Orovio's boat left Colombia; indeed, the ALEX LUZ apparently set sail under orders from the United States detailing the size of the cargo and the point of rendevous with the boats that were to take the cargo into the United States. The ALEX LUZ would never have left Colombia, and therefore Michelena-Orovio would have had no opportunity to earn his wages as a crew member, had there been no distributors in the United States placing orders for the contraband.[15]

In summary, the fact that the defendant is involved in importing a huge quantity of marijuana into the United States may establish both the defendant's knowledge of and his joinder in the conspiracy to possess with intent to distribute. Since twelve tons of marijuana is more than mere mortals could personally consume in a lifetime, *United States v. Cortez,* 521 F.2d 1, 4 (5th Cir.1975), someone must have an intent to distribute the contraband. The defendant's awareness of the existence of the conspiracy flows from his participation in the conspiracy to import such a large quantity, for in the absence of any legal market in which to dispose of his wares, there is no reason to import the goods if there has been no plan made for their distribution. Similarly, the defendant's joinder or interest in the conspiracy to distribute may be inferred from

his involvement in the importation scheme, for he would have no importing job if there was no conspiracy to distribute. Finally, the act of importation itself is an act in furtherance of the conspiracy to possess with intent to distribute, for there would be no distribution scheme if there were no marijuana to distribute. *See United States v. Tramaglino,* 197 F.2d 928, 930–31 (2d Cir.), *cert. denied,* 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952).

### 3. The Mere Colombian Seaman.

■ Michelena-Orovio argues further that the absence of actual contact with the United States and his status as a "lowly non-English speaking seaman" further weakens the case against him. Michelena-Orovio's first argument concerns the fact that he, a Colombian national, was discovered on a foreign vessel on the high seas. He maintains that the evidence proved only that he was on a vessel loaded with marijuana headed for the United States, but that plans never actually called for his entry into this country. While the evidence might be sufficient to demonstrate that he knew that the vessel contained contraband and that he had joined in the conspiracy to bring it close enough to the United States for someone else to import it, he maintains that there is no evidence that he knew of or cared about the contraband's fate once it reached American shores.[16]

The location and nationality of the vessel and its crew has no bearing on the issues in this case: knowledge of and participation in the conspiracy to possess marijuana with intent to distribute it. In a case where the

---

15. In *Rodriguez,* defendants Smigowski and Martins were acquitted of conspiracy to possess with intent to distribute on the same theory as was Captain Cadena: the defendants "could each receive his reward and be done with the scheme" without making any "arrangements to dispose of their treasure." 585 F.2d at 1247. Again, they would have received no reward had there been no distribution scheme.

16. When we affirmed the defendant's conviction in *United States v. Chaparro-Almeida,* 679 F.2d 423 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 801, 74 L.Ed.2d 1004 (1983), we attempted to distinguish *Cadena* on the same ground that Michelena-Orovio urges here. We noted that Cadena's boat had been further out to sea than was the defendant's, and that "there was no supporting evidence [in *Cadena* ] of any intention to deliver the contraband to the United States." 679 F.2d at 430. Michelena-Orovio has also pointed out that the boats in both *Mann, supra,* and *Mazyak, supra,* were American vessels, from which the jury could infer that the boats were planning to return home to distribute their cargo *within* the United States.

Coast Guard has happened upon a marijuana-laden vessel on the high seas, there may be an issue about whether the cargo is bound for the United States, and thus whether this country has jurisdiction to prosecute the foreign crewmembers. *See, e.g., United States v. Freeman,* 660 F.2d 1030, 1034–35 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982) (holding that evidence of United States destination was sufficient to give court jurisdiction where defendants were found on board American vessel off coast of Mexico); *United States v. Jonas,* 639 F.2d 200, 205 (5th Cir.1981) (holding that United States had jurisdiction to prosecute defendants for conspiracy to possess with intent to distribute where defendants were found on board American vessel laden with marijuana sixty to eighty miles from the Florida Keys); *United States v. Ricardo,* 619 F.2d 1124, 1128–29 (5th Cir.), *cert. denied,* 446 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980) (United States had jurisdiction to prosecute Colombian and American seamen for conspiracy to import and to possess marijuana with intent to distribute where defendants were found on board American vessel 125–150 miles from the Texas coast and cargo was destined for United States); *United States v. Baker,* 609 F.2d 134 (5th Cir.1980) (possession of large quantity of marijuana on an American vessel outside United States territorial waters but within "customs waters" is crime under 21 U.S.C. § 841(a)(1) where it was clear intended distribution would occur in United States); *see also United States v. Marino-Garcia,* 679 F.2d 1373 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 748, 74 S.Ct. 967 (1983) (United States has jurisdiction to prosecute persons found on board stateless vessel on the high seas for possession of marijuana with intent to distribute it in violation of 21 U.S.C. § 955a). These cases hold that the government need not prove any overt act within the United States in order to convict a defendant of conspiracy to possess marijuana with intent to distribute it as long as there is sufficient evidence that the conspiracy was to be consummated within United States territory. *See, e.g., Ricardo, supra; Baker, supra.* Michelena-Orovio has never disputed the fact that the cargo's ultimate destination was the United States, a fact evidenced by Agent Donald's testimony about the Louisiana-based portion of the conspiracy.

Michelena-Orovio's nationality does not weaken the inference of his knowledge that a conspiracy to distribute the contraband must exist or of his knowing facilitation of that conspiracy. While a foreign national may not have the same detailed knowledge of our laws as a United States citizen might have, it would hardly be irrational for a jury to infer that Michelena-Orovio knew that the possession and distribution of marijuana in the United States is illegal. After all, both are also illegal in Colombia, and indeed, in most parts of the world. Therefore, to the extent that participation in the conspiracy to distribute may normally be inferred from participation in the conspiracy to import a large quantity of contraband, in light of the absence of a legal market for the imported goods, Michelena-Orovio's knowledge of and dependence on the existence of the distribution scheme are the same as those of his American counterpart.[17]

█ We note further that a defendant's distribution of the contraband need not be

---

**17.** In *United States v. Schmucker-Bula,* 609 F.2d 399, 402 (7th Cir.1980), the defendant challenged the criminal jurisdiction of the United States to convict him of conspiracy to import 100 kilograms of cocaine. He had been apprehended in the Dominican Republic, and he maintained that he was indifferent to the destination of the cocaine. He argued on the basis of *Falcone, supra,* that his activities as a seller were insufficient to make him liable as a conspirator in the importation. The Seventh Circuit rejected this argument and held that it was "sufficient that the conspirators knowingly encouraged and arranged the transportation of drugs that would end in the United States." 609 F.2d at 402 (citing *Cadena* and *Direct Sales*). The court stated further: "The sale of so large a quantity of cocaine was dependent upon the feasibility of smuggling it into the United States. Furthermore, the defendant cannot escape liability merely because the purchasers took primary responsibility for the smuggling arrangements." 609 F.2d at 402.

made to the ultimate consumer in order to convict him of conspiracy to possess with intent to distribute; it may, in appropriate circumstances, be made to a coconspirator. *United States v. Pool,* 660 F.2d 547, 561 (5th Cir.1981). In *Pool,* we held that the planned transfer of marijuana from the mother ship to the off-load boats 250 miles east-southeast of Jacksonville, Florida constituted "distribution as contemplated by 21 U.S.C. § 802(11)." 660 F.2d at 560. Even if Michelena-Orovio never planned to come anywhere near the United States, there was evidence from which the jury could have inferred that he planned to aid in the transfer of the marijuana from the ALEX LUZ to the off-load boats, which were to take the cargo to the United States. Someone would have had to unload the cargo had the rendevous been successful. There was so much marijuana on board the ALEX LUZ that it took four or five customs workers to unload the vessel. Trial Transcript at 110. The jury could reasonably have concluded that Michelena-Orovio, one of eight crew members found on board the ALEX LUZ, intended to aid the other seven in unloading the cargo. Under these circumstances, we cannot say that the jury could not rationally have convicted the defendant of conspiracy to possess the marijuana with intent to distribute it, even if he was a foreign national found on board a foreign vessel on the high seas.

Finally, we note that to accept the defendant's proposed distinction would undercut the purposes of the narcotics laws. Both 18 U.S.C. § 846 and 18 U.S.C. § 963 were part of a congressional revision and recodification of the nation's narcotics laws "designed to deal in a comprehensive fashion with the growing menace of drug abuse in the United States." Comprehensive Drug Abuse Prevention and Control Act of 1970, H.R.Rep. No. 1444, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Ad.News 4566, 4567. In his message accompanying the proposed bill, the President stated that he wanted "successful prosecution of an increased national effort against illegal drug trafficking." *Legislation to Regulate Controlled Dangerous Substances and Amend Narcotics and Drug Laws, 1970: Hearings on H.R. 1444 Before the Subcomm. on House Ways and Means,* 91st Cong., 2d Sess. 196 (1970) (statement of Richard Nixon, President of the United States). *See also Rodriguez,* 612 F.2d at 915–17. No one can deny that the conspiracies in this case, like many before them, had roots in a field in Colombia. To hold that Michelena-Orovio cannot be implicated in the conspiracy to possess with intent to distribute because he is a foreign national who was found on the high seas would be to limit the government's ability to combat the drug trade at its source. We cannot conclude that Congress intended, or that the facts of this case warrant, such a result.

Michelena-Orovio's final argument is that the inference of participation in the distribution scheme should not be applied to him because, unlike the defendants in *Mazyak, Mann* and even *Cadena,* he was simply a lowly member of the crew. We recently rejected a similar argument in *United States v. Sockwell,* 699 F.2d 213 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2106, 77 L.Ed.2d 311 (1983). Sockwell was a member of the crew of a vessel that had been carrying 150,000 pounds of marijuana; after the marijuana was transferred to another boat, the crew burned and sank their ship. Sockwell was convicted of conspiracies to import and to possess with intent to distribute, as well as the substantive offenses of importation and possession. On appeal, Sockwell contended that his convictions should be overturned because "he was merely a cook for the vessel's crew and did not participate in any of the activities of the vessel." 699 F.2d at 215. We rejected this contention and found that testimony of the other crew members, as well as circumstantial evidence, demonstrated that he was a "participating and functioning member of the conspiracy throughout." *Id.* As in Michelena-Orovio's case, Sockwell had been a member of a small crew (five men) on board a marijuana-laden boat on a lengthy voyage. *See United States v. Alfrey,* 620 F.2d 551, 556 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160

(1980). Further, in each case all of the crew members presented a single fabricated story.

 Michelena-Orovio's lowly employee argument is in essence no more than a variation on the "mere presence" argument rejected in our discussion of the importation count. As was discussed in our disposition of the defendant's argument with regard to the importation count, more than mere presence was established in this case. The jury determined that the evidence demonstrated beyond a reasonable doubt that Michelena-Orovio was aware of and participated in the conspiracy to import a large quantity of marijuana. He was not a mere employee, but an employee aware of the nature of his business. It is well settled in this circuit that a conviction will not be reversed for lack of evidence merely because the defendant played only a minor role in the overall scheme. *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981) (affirming conviction of conspiracy to import marijuana of Colombian supplier's friend who intended to be present at the remote off-loading site for the marijuana). While the trial court might wish to take Michelena-Orovio's status as an employee into account in sentencing the defendant, his status as an employee does not weaken the inference of his knowledge of or complicity in the distribution scheme.

### 4. Other Circuits.

Finally, we note that other circuits have permitted the jury to infer intent to distribute from the size of the cache. In *United States v. Smith,* 680 F.2d 255 (1st Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983) (citing *United States v. DeWeese,* 632 F.2d 1267 (5th Cir.1980), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981), *United States v. Alfrey,* 620 F.2d 551 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980), and *Cadena* ), the First Circuit relied on the factors that we set forth in *Alfrey* and *DeWeese* in its affirmance of the de-

fendant's conviction of conspiracy to possess marijuana on the high seas with intent to distribute under 21 U.S.C. §§ 963 and 955a. The facts in *Smith* were strikingly similar to the case before us. The unregistered flagless vessel was seized on the high seas, one hundred miles off the coast of Massachusetts. On board were two Americans (one of whom was defendant Smith), ten Colombian nationals, and 263 bales of marijuana. The boat was bound for the United States from Colombia. The First Circuit was unpersuaded by the defendant's claim that he was merely hitching a ride back home, in light of the length of voyage, the large quantity of marijuana on board, and the necessarily close relationship between Smith and the crew.

The Eleventh Circuit has affirmed the convictions of numerous defendants charged with conspiracy to possess contraband on the high seas with the intent to distribute it in violation of 21 U.S.C. § 955c (Supp. V 1981), where the defendants were in possession of a large amount of contraband. *See, e.g., United States v. Ceballos,* 706 F.2d 1198, 1201–03 (11th Cir.1983) (affirming conspiracy convictions and convictions of substantive offenses of crewmembers found on board shrimping vessel laden with 27,520 pounds of marijuana forty-five miles off the Florida coast); *United States v. Curra-Barona,* 706 F.2d 1089, 1091 (11th Cir.1983) (affirming conviction of conspiracy and possession on high seas of persons found on board pleasure craft strewn with bales of marijuana five miles south of the Bahamas); *United States v. Munoz,* 692 F.2d 116 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1229, 75 L.Ed.2d 463 (1983) (affirming convictions of conspiracy to import marijuana and conspiracy to possess it knowing that it would be imported of persons—including crewmember—found on board Panamanian vessel laden with twenty-three tons of marijuana off the coast of Florida); *United States v. Quesada-Rosadal,* 685 F.2d 1281 (11th Cir.1982) (affirming convictions of conspiracy to possess with intent to distribute on the high seas and possession of persons found on board American vessel observed running without lights

sixty miles southeast of Miami and found to contain 5120 pounds of marijuana); *United States v. Groce,* 682 F.2d 1359, 1365 (11th Cir.1982) (affirming convictions of conspiracies to import and to possess marijuana with intent to distribute it within United States of persons found on board fishing boat forty miles off Florida Coast with more than 100 pounds of marijuana floating in sea nearby); *United States v. Julio Diaz,* 678 F.2d 1031, 1033 (11th Cir.1982) (affirming convictions of crewmembers of conspiracy to possess marijuana on the high seas with intent to distribute it where presence of large amount of contraband on board was obvious).

Other circuits have followed ours in affirming convictions of persons allegedly involved in land-based conspiracies to import and to possess with intent to distribute. In *United States v. Laughman,* 618 F.2d 1067 (4th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980), the Fourth Circuit affirmed the convictions of conspiracy to possess with intent to distribute of persons involved in the transfer of over two tons of marijuana from a Colombian-type sailing vessel to vehicles waiting on land. The court stated that "the amount of marijuana involved ... sufficiently establishes that there was an intent to distribute." 618 F.2d at 1074 n. 4 (citing *United States v. Villareal,* 565 F.2d 932 (5th Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978)). In *United States v.*

*Allen,* 675 F.2d 1373 (9th Cir.1980), *cert. denied,* 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981), the conspirators were apprehended while they were unloading boxes of marijuana from a boat that had been spotted offshore. Allen, the owner of the property where the rendezvous took place, was convicted of both conspiracy to import and conspiracy to possess with intent to distribute, and the other defendants were convicted of the second conspiracy. Affirming the convictions, the Ninth Circuit stated that the defendants' attack on the sufficiency of the evidence concerning intent to distribute was baseless: "Personal consumption of 17,000 pounds of anything, much less marijuana, is a staggering proposition sufficient to compel disbelief, leaving commercial distribution the only realistic goal of the enterprise." 675 F.2d at 1384.[18]

## III. CONCLUSION.

As the Supreme Court recognized in *Direct Sales,* the strength of an inference of knowledge of and participation in an illicit conspiracy based on the sale of goods to the conspirators is dependent on the nature of the goods sold. Today we hold that once the jury had reasonably concluded, on the basis of the factors described earlier in this opinion, that the defendant was guilty of conspiracy to import marijuana, it was entitled to infer from the quantity involved that the defendant was also guilty of participation in the conspiracy to possess the

---

**18.** *See also United States v. DuFriend,* 691 F.2d 948 (10th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 820, 74 L.Ed.2d 1017 (1983) (affirming defendant's conviction of conspiracies to import 600 pounds of marijuana in a small airplane and to possess with intent to distribute it, and holding that evidence of a large quantity of a controlled substance was relevant to intent to distribute) (citing *United States v. Palmere,* 578 F.2d 105, 108 (5th Cir.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979)); *United States v. Watkins,* 662 F.2d 1090 (4th Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1982) (affirming convictions of conspiracy to possess with intent to distribute of crew members observed washing marijuana residue off decks of a vessel found on the intercoastal waterways, but reversing convictions of conspiracy to import because the government failed to demonstrate that the

marijuana came from a foreign source); *United States v. Prieskorn,* 658 F.2d 631 (8th Cir.1981) (affirming convictions of conspiracy to possess cocaine with intent to distribute on the basis of the large quantity and extended period of time involved); *but see United States v. Boone,* 641 F.2d 609, 611–12 (8th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981) (citing *Direct Sales, supra,* and *United States v. Rojas,* 537 F.2d 216, 222 (5th Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) for the proposition that "the jury is entitled to consider the size of the transaction in its determination of whether a scheme to distribute the drugs existed," but expressing doubts "that any one of these factors alone would be sufficient to permit a jury to find Boone guilty of a conspiracy to distribute illegal drugs.").

marijuana with intent to distribute it.[19] To the extent that *Cadena* and *Rodriguez* held otherwise, they are overruled.

The defendant's conviction on both counts is AFFIRMED.

WISDOM, Circuit Judge, with whom RUBIN, POLITZ and TATE, Circuit Judges, join, dissenting:

I respectfully dissent. I stand by the panel decision. 702 F.2d 496, 501. There is not a shred of evidence in the record to show that Michelena-Orovio "possess[ed] with intent . . . to distribute" the 365 bales of marijuana carried by the vessel on which he served as a seaman. His function as a seaman in importing the marijuana was to terminate on delivery of the cargo to another vessel on the high seas, before any distribution of the contraband could take place. The sweep of the en banc opinion and the overbroad implications of its reasoning impel me to make the following brief observations.

The en banc opinion rests not on the evidence, but on a figure of speech: a conspiracy is a single chain and each conspirator is a link. This premise is a deceptively appealing shortcut to evidence overcoming the presumption of innocence. The notion that the conspiracy in this case is a chain begs the question. If one accepts the premise, of course each person performing a function relating to handling the contraband—from the grower in Colombia, to the first purchaser, to the middleman, to the crewmen on a ship transporting the contraband, down to the retailer—is guilty of conspiring to import and to "possess with intent to distribute" the contraband. No doubt there are some conspiracies that may aptly be described as a chain in which an individual conspirator is an essential link, although he may not have any idea of details of the scheme and may be unknown to some other conspirators. That is not this case. Here the United States did not charge a single massive venture to import, sell, and distribute, as it did in *United States v. Bruno,* 2 Cir., 105 F.2d 921, *rev'd on other grounds,* 1939, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257. The indictment has two separate counts, one for importation and another for distribution, because the facts point to two separate conspiracies, at least with respect to some of the participants, the most conspicuous of whom was seaman Michelena-Orovio.

In dealing with the difficult problem of narcotics control, Congress chose to distinguish between the crime of conspiring to import controlled drugs in violation of 21 U.S.C. § 963 (1976) and the crime of conspiring to possess such drugs with intent to distribute them in violation of 21 U.S.C. § 846 (1976). This is not to say that the same defendant can never be guilty of both offenses. But the effect of the majority decision is that a violation of section 963 now automatically entails a violation of section 846—whenever the principal basis for conviction under section 963 rests on the inference that the large amount of contraband seized necessarily shows intent to import on the part of seamen on the vessel carrying the contraband. Such an inference is a non sequitur as to distribution, however, because it fails to take into account the element of *intent* necessary for proof of the crime.

**19.** Our holding today does not mean that a violation of 21 U.S.C. § 963 will automatically entail a violation of 21 U.S.C. § 846 or vice versa. A person could conceivably be guilty of one conspiracy without being guilty of the other. For example, if crew member A had a small amount of marijuana that he did not wish to leave on board the ship when he visited the United States, and if he convinced crew member B to create a distraction while A went through the customs inspection, both might be convicted of conspiracy to import, but the small quantity of contraband would not give rise to the inference that they had any plan for its distribution. Similarly, if A and B decided to grow two tons of marijuana on their Louisiana farm, or if C were selling large quantities of marijuana on his college campus, neither the college drug dealer nor the farmers would necessarily be involved in any importation scheme. *See Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). Conviction of both conspiracies would be conceivable only where a large quantity of marijuana had arrived from a foreign source.

In this case, one may reasonably infer from the size of the cargo knowledge and intent on the part of the defendant to participate in the conspiracy to import the contraband. But that inference cannot do double duty and show as well intent to distribute when the defendant had no role to play in distribution. With deference, I suggest that in the circumstances of this case, considering especially that Michelena-Orovio's role was to terminate on delivery of the marijuana to another vessel on the high seas, 150 to 200 miles from our shores, the only rational inference that can be drawn is that the defendant did *not* intend to play any part in any ongoing conspiracy to distribute the marijuana. The distribution in the United States, assuming that it was to take place in the United States, was to be handled by others. As Judge Alvin Rubin pointed out in *United States v. Rodriguez*:

> [T]here was literally no evidence with respect to the involvement of Martins and Smigowski [two of the four defendants] in a distribution scheme except what might be inferred from their participation in an agreement to import it. The direct and circumstantial evidence that they were peripheral participants in the importation scheme does not refute, beyond a reasonable doubt, the hypothesis that they had no knowledge of a conspiracy to distribute once it reached these shores.
>
> Unlike Rodriguez and Albernaz, who perforce had to make some arrangements to dispose of their treasure, Smigowski and Martins could each receive his reward and be done with the scheme.... [P]ossession of a large supply of a prohibited substance may justify the inference that the possessor intended to distribute it, but there was no evidence that Smigowski and Martins had sufficient dominion over or interest in the marijuana to warrant the inference.

5 Cir.1978, 585 F.2d 1234, 1247, *aff'd en banc* 612 F.2d 906, *aff'd sub nom. Abernaz v. United States,* 1981, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275.

"In the case of an inference, the existence of B may be deduced from A by the ordinary rules of reason and logic." 1 J. Weinstein & M. Berger, *Weinstein's Evidence* § 300[01]. The correct drawing of an inference "is based upon logic and experience, not upon law". Gausewitz, *Presumptions in a One-Rule World,* 5 Vand.L.Rev. 324, 327 (1952). When there is no evidence that a crew member had a stake in the distribution or an awareness of or interest in the distribution of the contraband, the logical inference is that the crew member joined in a conspiracy to import marijuana for delivery to another vessel on the high seas without any intention to join the conspiracy to distribute. This inference is especially applicable to Michelena-Orovio because he lacked any contacts with the United States. This case is even stronger than *Cadena* because here the parties stipulated that the defendant, unlike Cadena, was not the captain of the vessel. It is stronger than *Rodriguez* because the defendants acquitted of the conspiracy to distribute in that case were Americans who were more actively involved than Michelena-Orovio in the conspiracy to import and were seamen on the *receiving* ship.

The essence of conspiracy is agreement knowingly entered into by the parties. "[P]roof of an agreement to enter a conspiracy is not to be lightly inferred." *United States v. Johnson,* 5 Cir., 439 F.2d 885, 888, *cert. denied sub nom. Golub v. United States,* 404 U.S. 880, 92 S.Ct. 213, 30 L.Ed.2d 161 (1971). In *Direct Sales Co. v. United States,* 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674, on which the majority opinion relies, a drug manufacturer and wholesaler had supplied large amounts of morphine sulphate to a doctor for several years. The government charged the manufacturer with conspiracy to distribute narcotics unlawfully because the amounts of morphine supplied were so large that the manufacturer must have known that the doctor was distributing the drug illegally. The Court said:

> When the evidence discloses such a system, *working in prolonged cooperation* with a physician's unlawful purpose to supply him with his stock in trade for his

illicit enterprise, there is no legal obstacle to finding that the supplier *not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible.* The step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. *There is informed and interested cooperation, stimulation, instigation. And there is also a "stake in the venture" which, even if it may not be essential, is not irrelevant to the question of conspiracy.* 319 U.S. at 713, 63 S.Ct. at 1270, 87 L.Ed. at 1682 (footnotes omitted and emphasis supplied). The kinds of facts which justifiably led to an inference of guilt in *Direct Sales* are singularly lacking here.

The use of one dubious inference to do double duty for two different crimes undermines the presumption of innocence due an accused and interferes with the factfinding process.

> The key problem with permissive inferences is that they isolate and abstract a single circumstance from the complex of circumstances presented in any given case, and, on proof of that isolated fact, authorize an inference of some other fact beyond reasonable doubt. Conviction is authorized by the permissive inference in all cases in which the predicate fact appears, even though the correlation between the predicate fact and the element to be inferred is less than perfect. Permissive inferences thus permit juries to avoid assessing the myriad facts which make specific cases unique. Analysis, as Supreme Court opinions demonstrate, is drawn to likelihoods. The thesis pursued here is that any structure which reduces criminal cases to a simplified assessment of what might be called the "chances of guilt" is fundamentally at odds with the concept of reasonable doubt, and hence to be discouraged as a mode of determining the ultimate question of guilt or innocence.

Nesson, *Reasonable Doubt and Permissive Inferences: The Value of Complexity,* 92 Harv.L.Rev. 1187, 1192 (1979) (footnote omitted).

*United States v. Bell,* 5 Cir.1982, 678 F.2d 547 (en banc), *aff'd,* 1983, —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638, restated the standard of review in this circuit on the sufficiency of the evidence in a criminal case. That standard is whether a "reasonable trier of fact could [have found] that the evidence establish[ed] guilt beyond a reasonable doubt". *Id.* at 549. That articulation of the standard for appellate review has not eroded, nor could it, the constitutional requirement of a reasonable doubt standard. I agree with Judges Anderson and Roney, concurring specially: "Judge Vance's opinion does not change the substantive law of this circuit with respect to the standard of review for sufficiency of the evidence .... *[I]f a hypothesis of innocence is sufficiently reasonable and sufficiently strong, then a reasonable trier of fact must necessarily entertain a reasonable doubt about guilt.*" *Id.* at 550. As I see this case, there was such a strong hypothesis that Michelena-Orovio intended to limit his activities to his seaman's job in transporting the marijuana to another vessel that a reasonable trier of fact must necessarily entertain a reasonable doubt that he was guilty of the crime of possessing the drug with the intent of distributing it in the United States.

The position I advocate is not contrary to congressional objectives in enacting drug control legislation. The real culprits in this case, as in many similar cases, are the American ringleaders who made arrangements with the grower or broker in Colombia and unquestionably arranged for the purchase, transportation, and distribution in this country. They are guilty of conspiracy to import and conspiracy to distribute and perhaps other conspiracies as well. But Michelena-Orovio, the lowly Colombian seaman on the edge of the conspiracy to import, should not be punished twice by expediently adding a tenuous inference to an attenuated inference. The majority has succumbed to an alluring figure of speech as a substitute for facts and reason.